UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HORTON HOMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07-CV-506-MEF |
| | ) | |
| LARUE BANDY, MARIE BANDY, | ) | |
| PATRICK PRITCHETT, WILLIAM | ) | |
| SHANER, ELSIE FONDREN | ) | |
| AVERETTE, WILLIAM CRUTHIRDS, | ) | |
| and SHERRIE CRUTHIRDS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF HORTON HOMES, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AGAINST DEFENDANTS' ARBITRATIONS

James L. Paul
Thomas C. Grant
Chamberlain, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E. – Thirty-Fourth Floor
Atlanta, Georgia 30303
(404) 659-1410

Sydney F. Frazier
Cabaniss, Johnston, Gardner, Dumas & O'Neal
2001 Park Place North, Suite 700
Birmingham, Alabama 35203
(205) 716-5291

*Co-counsel for Plaintiff Horton Homes, Inc.*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................- 1 -

II.    STATEMENT OF FACTS. ................................................................- 3 -

    A.    Defendants Each Purchased a Manufactured Home from H&S Pursuant to a "Retail Installment Contract" That Included an Arbitration Agreement ....................................- 4 -

    B.    Defendants Are Attempting to Arbitrate against Plaintiff Horton Pursuant to the Defendants' Arbitration Agreements, Even Though Plaintiff Horton Is Not a Party to Any of Those Agreements ...................................................................- 5 -

    C.    Defendants Cannot Manufacture a Basis for Arbitrating Claims Against Plaintiff Horton by Alleging Alter Ego .................- 8 -

        1.    Plaintiff Horton Has Manufactured Homes Since 1970 ...................................................................- 10 -

        2.    In 1996, Plaintiff Horton Invested in a Dealer as Part of a Strategy to Increase Its Dealer Network and Drive Sales .........................................................- 11 -

        3.    H&S Homes Maintained an Entirely Separate Existence from Plaintiff Horton ............................- 12 -

        4.    The demise of H&S Homes left Plaintiff Horton holding $14.4 Million of unpaid notes ..................- 14 -

III.    ARGUMENT AND CITATION OF AUTHORITIES ...........................- 15 -

    A.    The Court Should Enjoin Defendants from Attempting to Arbitrate Against Plaintiff Horton Pursuant to the Defendants' Arbitration Agreements ................................- 15 -

    B.    Plaintiff Horton Has a Substantial Likelihood of Success on the Merits .........................................................................- 16 -

1.    Plaintiff Horton Is Not A Proper Party to Any Arbitration Filed Pursuant to Defendants' Arbitration Agreements Because Plaintiff Horton Has Not Agreed to Arbitrate with Defendants.................................................- 17 -

    a)    The Federal Arbitration Act Governs This Matter Because It Concerns Attempted Arbitration of Contracts That Involve Interstate Commerce.................................................................- 17 -

    b)    Defendants Cannot Force Plaintiff Horton to Arbitrate Because Plaintiff Horton Has Not Agreed to Arbitrate with Defendants .........................- 18 -

        i)    The Federal Arbitration Act Requires a Written Arbitration Agreement .......................- 18 -

        ii)    Threshold Determinations of Arbitrability Must Be Decided by This Court, Not by an Arbitrator ............................- 21 -

        iii)    Plaintiff Horton Has Not Waived Its Right to Seek This Court's Determination of Arbitrability.................................................- 23 -

        iv)    Plaintiff Horton Has a Right to Have a Jury Determine Issues That Affect Arbitrability .....................................................- 25 -

2.    Defendants Cannot Prevail on Their Argument That Plaintiff Horton Is Subject to Any Arbitration Agreements as an Alter Ego of H&S Homes .....................- 27 -

    a)    Because Plaintiff Horton and H&S Are Both Georgia Entities, Georgia Law Controls Defendants' Alter Ego Argument ...............................- 28 -

    b)    Defendants Bear the Burden of Proof on Their Alter Ego Argument ....................................................- 29 -

       c)    Under the Facts, Defendants Cannot Pierce the Corporate Veil by Making Plaintiff Horton Liable as the Alter Ego of H&S Homes ..................... - 30 -

          i)    Georgia Law Mandates Great Caution in Disregarding Corporate Entity Existence ........ - 30 -

          ii)    Georgia Courts Apply a Specific Standard When Determining Whether to Pierce the Corporate Veil in Response to an Alter Ego Claim .......................................... - 32 -

          iii)   Under Georgia Law and the Facts of This Case, Defendants Cannot Hold Plaintiff Horton Liable as the Alter Ego of H&S Homes ............................................................ - 33 -

  C.    There Is a Substantial Threat of Irreparable Injury to Plaintiff Horton If the Preliminary Injunction Is Not Granted ..................... - 37 -

  D.    The Threatened Injury to Plaintiff Horton from Allowing the Arbitrations to Proceed Outweighs the Threatened Harm That the Injunction May Cause to Defendants ............................... - 39 -

  E.    Granting Preliminary Injunctive Relief in This Case Is Not Adverse to the Public Interest ......................................................... - 39 -

IV.    CONCLUSION. .................................................................................. - 40 -

NOW COMES Plaintiff Horton Homes, Inc. ("Plaintiff Horton" or "Horton Homes") and files this its Brief in Support of its "Motion for Preliminary Injunction Against Arbitrations" ("Plaintiff Horton's Motion for Preliminary Injunction"), and states as follows:

## I.    <u>INTRODUCTION.</u>

Defendants are trying to force Plaintiff Horton to arbitrate with Defendants, without a basis in fact or law.  Plaintiff Horton seeks a preliminary injunction prohibiting these improper arbitrations, pending final hearing.  The requested preliminary injunction will preserve the status quo and prevent Horton Homes from being subject to improper arbitrations, while this Court can rule on the contested issue of arbitrability and decide whether to enter the permanent injunction and the declaratory judgment that Horton Homes has requested in this action.[1]

This matter is governed by the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*, which requires that a party must sign a written arbitration agreement before being compelled to participate in arbitration.  Even though Defendants do not allege and cannot prove that Horton Homes has signed any

---

[1]  After this action was filed, Defendant Shaner obtained an arbitration award.  The relief sought respecting Defendant Shaner must be adjusted accordingly.

agreement to arbitrate any issues with Defendants, Defendants nonetheless have filed and pursued arbitrations against Horton Homes.

Recognizing the absence of any arbitration agreement with Horton Homes, Defendants apparently intend to argue that Horton Homes should be bound by arbitration agreements signed by another separate entity, H&S Homes, LLC ("H&S"). Defendants predicate this argument on an "instrumentality theory" alleging this Court should disregard the fact that Horton Homes is an entirely separate legal entity from H&S.[2]

Whether Horton Homes is susceptible to arbitration is an issue of arbitrability that is exclusively within this Court's jurisdiction; the arbitrator cannot properly determine the issue of arbitrability respecting a party *which has not signed an arbitration agreement*. Accordingly, even if Defendants' instrumentality theory had merit, an injunction is still necessary to allow this Court to exercise its obligation to determine arbitrability, before Horton Homes is forced to proceed with arbitrations that it contends are improper. Therefore, the Court should grant Plaintiff Horton's Motion to Enjoin Arbitration, to preserve Plaintiff

---

[2]     Defendants have simply alleged in their arbitration demands and in their Answer in the instant case that H&S Homes is an instrumentality of Plaintiff Horton, without further support or explanation. Although Defendants have the burden of proof on their alter ego argument, the facts do not justify a finding that Plaintiff Horton is subject to any arbitration agreement as an alter ego of H&S Homes, as explained below in Section III.B.2 of this Brief.

Horton's right to contest arbitrability, without the uncertainty as to whether to participate in the contested, currently pending arbitrations.

## II.    STATEMENT OF FACTS.

This case concerns five manufactured homes (the "Subject Manufactured Homes") that were built by Horton Homes and sold to H&S, one of approximately 200 dealers who purchase homes from Plaintiff Horton.  H&S offered the homes for sale at sales lots located in Alabama and other states.  Defendants purchased these manufactured homes from H&S.  Because of alleged problems with these manufactured homes, Defendants filed arbitration demands against both H&S and Horton Homes.  Horton Homes objects to its inclusion in these arbitrations because Horton Homes neither sold the Subject Manufactured Homes to Defendants nor entered into any arbitration agreements with Defendants.

The Court has scheduled an evidentiary hearing on Plaintiff Horton's Motion for Preliminary Injunction commencing September 24, 2007.  The Fact Statement set forth herein briefly summarizes evidence Plaintiff Horton anticipates proffering at this hearing.

A.  **Defendants Each Purchased a Manufactured Home from H&S Pursuant to a "Retail Installment Contract" That Included an Arbitration Agreement.**

Defendants purchased the Subject Manufactured Homes from H&S in 1999 and 2000.[3]  To effect their purchases, the Defendants[4] each entered into a "Retail Installment Contract" with H&S that included an arbitration agreement[5]

---

[3]    Specifically, Defendants purchased the Subject Manufactured Homes in five different sales:

- Defendant Larue Bandy and Defendant Marie Bandy (collectively, the "Bandy Defendants") purchased their home on April 12, 1999 (Compl., Ex. "F");
- Defendant Patrick Pritchett purchased his home on June 4, 1999 (Compl., Ex. "I");
- Defendant William Shaner purchased his home on October 12, 1999 (Compl., Ex. "K");
- Defendant Elsie Averette purchased her home on June 17, 2000 (Compl., Ex. "M"); and
- Defendant William Cruthirds and Defendant Sherrie Cruthirds (collectively, the "Cruthirds Defendants") purchased their home on June 17, 2000 (Compl., Ex. "N").

[4]    It is unclear whether Defendant William Shaner actually purchased one of the Subject Manufactured Homes.  Although he has filed an arbitration complaining about such a home, the "Retail Installment Agreement" associated with this home appears to have been signed only by his mother, Cliffie Shaner. For this reason, it is unclear based on presently known facts whether Defendant William Shaner purchased the home that is the subject of his arbitration filed against H&S and Horton Homes.

[5]    Copies of the "Arbitration Agreements" entered into by Defendants (collectively referred to as the "Defendants' Arbitration Agreements") are attached as Exhibits to Plaintiff Horton's Complaint, as follows:

- The "H&S/Bandy Arbitration Agreement" (Compl., Ex. "A");
- The "H&S/Pritchett Arbitration Agreement" (Compl., Ex. "B");

(sometimes collectively referred to as the "Defendants' Arbitration Agreements"). The Defendants' Arbitration Agreements are between each of the Defendants and H&S. *Horton Homes is not a party to any of the Defendants' Arbitration Agreements and did not sign any of the Defendants' Arbitration Agreements.* Furthermore, Horton Homes also is not a party to any of the "Retail Installment Contracts" entered into by Defendants.

The Defendants' Arbitration Agreements require Defendants and H&S to arbitrate all disputes, claims or controversies arising from or relating to the Retail Installment Contracts by which the Defendants purchased the Subject Manufactured Homes from H&S. Also, each of the Defendants' Arbitration Agreements specifies that it concerns a transaction in interstate commerce and shall be governed by the FAA.

**B.**    **Defendants Are Attempting to Arbitrate against Plaintiff Horton Pursuant to the Defendants' Arbitration Agreements, Even Though Plaintiff Horton Is Not a Party to Any of Those Agreements.**

Each of the Defendants, represented by the same counsel, has attempted to pursue arbitration before the American Arbitration Association (the "AAA") against both H&S and Horton Homes for claims concerning the Subject Manufactured Homes. (These five arbitrations are collectively referred to as the

- The "H&S/Shaner Arbitration Agreement" (Compl., Ex. "C");
- The "H&S/Averette Arbitration Agreement" (Compl., Ex. "D"); and
- The "H&S/Cruthirds Arbitration Agreement" (Compl., Ex. "E").

"Defendants' Arbitrations".)  Defendants admit that the claims asserted in their arbitrations are within the scope of Defendants' Arbitration Agreements, because Defendants have filed their arbitrations pursuant to these agreements, copies of which are referenced in and attached to their arbitration demands.[6]

Even though Horton Homes is neither a party nor a signatory to any of the Defendants' Arbitration Agreements upon which Defendants base their arbitrations, Defendants have included Horton Homes as a respondent in all of Defendants' Arbitrations, along with H&S.  Because Defendants lack any basis to include Horton Homes in the Defendants' Arbitrations, Horton Homes has objected to the arbitrator's jurisdiction over Horton Homes in each of these proceedings, as follows:

- <u>Bandy Defendants</u>:  Plaintiff Horton submitted an "Objection and Motion to Dismiss in this Arbitration", objecting to its inclusion because Plaintiff Horton has not agreed to arbitrate with the Bandy Defendants.  A copy of Plaintiff Horton's "Objection and Motion to Dismiss" is attached as Exhibit "A" to Plaintiff Horton's Motion to Enjoin Arbitrations.  Plaintiff Horton's counsel reiterated its objection at a July 6, 2007 telephonic status conference before the arbitrator,

---

[6]     *See* Compl., Exs. "F" and "G" (Bandy Defendants); Exs. "H" and "I" (Defendant Patrick Pritchett); Exs. "J" and "K" (Defendant William Shaner); Ex. "M" (Defendant Elsie Averette); Exs. "M" and "N" (Cruthirds Defendants).

retired Judge William Gordon, who agreed to stay proceedings in the Bandys' arbitration for two weeks, in order to see when this Court would set a hearing on Plaintiff Horton's Motion to Enjoin Arbitrations. This arbitration has now been stayed pending disposition of the instant case.

- <u>Defendant Pritchett</u>: Plaintiff Horton's arbitration counsel sent two emails, dated October 6, 2006 and October 16, 2006, to the AAA stating its objection to being included in Defendant Pritchett's arbitration, due to a lack of any agreement to arbitrate with Defendant Pritchett. Copies of these two emails are attached as Exhibits "B" and "C" to Plaintiff Horton's Motion to Enjoin Arbitrations.

- <u>Defendant Shaner</u>: Plaintiff Horton initially objected to its inclusion in Defendant Shaner's arbitration by filing its "Answer of Respondent Horton Homes, Inc.", a copy of which is attached as Exhibit "D" to Plaintiff Horton's Motion to Enjoin Arbitrations. Additionally, at the beginning of Defendant Shaner's arbitration hearing on June 5, 2007, Plaintiff Horton again made an oral motion to dismiss on the record, which the Arbitrator took under advisement. Despite these objections, Defendant Shaner pursued the arbitration against Plaintiff Horton, which resulted in a purported $487,500.00 award against Plaintiff

Horton and H&S Homes, jointly and severally. A copy of this July 6, 2007 "Award of Arbitrator" is attached as Exhibit "E" to Plaintiff Horton's Motion to Enjoin Arbitrations. Plaintiff Horton has been forced to file a notice of appeal because the deadline for notice of appeal from the arbitration award preceded this Court's September 24, 2007 hearing.

- Defendant Averette:    On January 5, 2007, Plaintiff Horton's arbitration counsel sent a letter to Defendant Elsie Averette's arbitration counsel, objecting to arbitration against Plaintiff Horton Homes, Inc. A copy of this letter is attached as Exhibit "F" to Plaintiff Horton's Motion to Enjoin Arbitrations.

- Cruthirds Defendants:    On January 5, 2007, Plaintiff Horton's arbitration counsel sent a letter to the Cruthirds Defendants' arbitration counsel, objecting to arbitration against Plaintiff Horton Homes, Inc. A copy of this letter is attached as Exhibit "F" to Plaintiff Horton's Motion to Enjoin Arbitrations.

## C.    **Defendants Cannot Manufacture a Basis for Arbitrating Claims Against Plaintiff Horton by Alleging Alter Ego.**

Apparently realizing that they cannot prove Horton Homes signed an arbitration agreement, Defendants are relegated to alleging that H&S is the alter ego of Horton Homes. Thus Defendants apparently contend that when H&S

signed arbitration agreements, the signature of H&S is the signature of Horton Homes. As set forth in Section III.B., Defendants will have the ultimate burden of proof on this claim of alter ego. However, at the preliminary injunction stage, Plaintiff Horton must demonstrate that it has a likelihood of succeeding in defeating Defendants' alter ego allegations.

As shown below, Horton Homes began manufacturing homes in 1970. During the past 37 years it has grown to be one of the larger manufactured housing businesses in the southeastern United States. It sells its manufactured homes to dealers throughout the southeastern United States. The dealers sell to consumers such as the Defendants in this case. During its 37 year business history, Horton Homes has engaged in a number of business endeavors. In 1996 it made a strategic decision to invest in a manufactured housing dealership known as American Manufactured Homes, L.L.C which ultimately became H&S. Though Horton Homes initially owned only 60% of American Manufactured Homes L.L.C., it eventually became the 100% owner of this dealer and changed the name to H&S Homes, L.L.C. H&S was only one of approximately 200 dealers which purchased manufactured homes from Plaintiff Horton. Though the dealership grew in its initial years as the industry was growing, a nationwide slump in manufactured housing sales took its toll on this dealership and by 2003 H&S began to restrict its operations. During the entire existence of H&S, it operated as an

entirely separate entity, with separate operations, separate books and records, separate assets and liabilities and otherwise entirely separate operations.

Until Defendants articulate the factual basis for their claims of alter ego, Plaintiff Horton will not clearly understand the nature of evidence which must be presented in opposition. Some of the evidentiary points Plaintiff Horton anticipates establishing at the September 24, 2007 hearing are listed below.

### 1.    Plaintiff Horton Has Manufactured Homes Since 1970.

N. Dudley Horton, Jr. founded Plaintiff Horton in 1970; he continues as its Chief Executive Officer to this day. Horton Homes' 1970 operations began in an abandoned chicken house, with a total production capacity of three manufactured homes per week. In the ensuing 37 years, Horton Homes has grown to a 100-acre corporate campus and production facility in Eatonton, Georgia with a capacity of producing approximately 200 manufactured homes per week. Horton Homes has grown to be a significant player in the United States manufactured home industry and for decades has been one of the leading producers of manufactured homes in the southeastern United States.

Over its entire existence, Horton Homes has built approximately 144,000 manufactured homes. Even after experiencing a substantial industry-wide slump that has continued since approximately the last quarter of 2000, Horton Homes will

manufacture approximately 2,930 homes during fiscal 2007; it estimates total sales of $99,000,000 for its 2007 fiscal year, which ends August 31, 2007.

> **2.** **In 1996, Plaintiff Horton Invested in a Dealer as Part of a Strategy to Increase Its Dealer Network and Drive Sales.**

Plaintiff Horton, like most competing manufacturers, sells its manufactured homes at wholesale to dealers. The dealers generally have sales lots located throughout their market area. The dealers' inventories are spread over their sales lots and are available for inspection and sale to retail customers. Like most of its competing manufacturers, Horton Homes does not maintain retail sales lots.

During the mid 1990s, a number of Horton Homes' competing manufacturers invested in dealerships as a way of increasing the size of their existing dealer network, and developing a strategy to drive their sales. In reaction to various competitors' business strategies, Plaintiff Horton decided to invest with owners of an existing dealership operated by Wiley and Rob Douglas (the "Douglases"). At the time of the combination, the Douglases owned and operated approximately eight sales lots at which they were selling Plaintiff Horton's manufactured homes. The result of the business combination was that a new entity was formed, American Manufactured Homes, L.L.C. American Manufactured Homes, L.L.C. was owned 40% by the Douglases and 60% by Horton Homes. American Manufactured Homes, L.L.C. operated in the same manner as the approximately 200 other dealers in Horton Homes' dealer network.

- 11 -

Although American Manufactured Homes, L.L.C. began as a jointly owned entity with the Douglases in 1996, American Manufactured Homes, L.L.C. became a wholly owned subsidiary of Horton Homes in approximately 1998, when the Douglases withdrew. After the Douglases withdrew, the company name was changed from American Manufactured Homes, L.L.C. to H&S Homes, L.LC. and H&S continued its effort to build new sales lots throughout the southeast.

From 1996 through approximately late 2000, H&S increased its operations from approximately eight sales lots in several states, to 55 sales lots in eight southeastern states. This expansion made business sense because the manufactured home market was expanding throughout this period. However, each additional sales lot required further significant capital investments by H&S as set forth above. As necessary, H&S borrowed money from Horton Homes for this expansion.

**3.    H&S Homes Maintained an Entirely Separate Existence from Plaintiff Horton.**

As H&S Homes grew, it remained completely separate from Plaintiff Horton, in its management, its assets, its liabilities, its operating expenses, its books and records, and in other financial respects. For example:

- *Management*: H&S managed its affairs as a separate entity. Although some members of the management of H&S were also involved in the management of Horton Homes, management

decisions for H&S were always made separately, and distinctly, from any management decisions of Plaintiff Horton.

- ***Assets and Liabilities***: H&S' assets and liabilities have always been maintained separately from Horton Homes' assets and liabilities. Sales lots operated by H&S are either titled in H&S or leased by H&S. Manufactured home inventory held by H&S is titled in H&S and sold at retail to the consuming public by H&S.

- ***Employee Workforce***: H&S maintained its workforce at its locations, entirely separate from Horton Homes' workforce located at the manufacturing facility in Eatonton, Georgia. H&S' employees were paid by H&S. Horton Homes' employees are paid by Horton Homes.

- ***Books and Records***: H&S has always maintained its own books and records related to the operations, assets and liabilities. Likewise, Horton Homes maintains its books and records respecting its assets, liabilities and operations.

- ***No Commingling***: Neither the assets nor the liabilities of Horton Homes and H&S have been commingled.

### 4. The demise of H&S Homes left Plaintiff Horton holding $14.4 Million of unpaid notes.

Although H&S Homes appeared to be a promising venture during the first four years of existence, its plight followed that of the entire manufactured home industry, which suffered a massive decline beginning in approximately late 2000 and continuing until today. While the entire manufactured home industry sold approximately 350,000 units throughout the United States in 2000, the estimate for 2007 is only 100,000. This substantial decline is attributed to both the economic effects of September 11, 2001, as well as overly aggressive financing that caused a huge spike in the number of foreclosures of manufactured homes. Unfortunately for Plaintiff Horton and H&S Homes, the manufactured home industry has suffered an even more precipitous decline in the southeast United States. Consistent with this industry-wide slump, H&S Homes operations decreased from 55 sales lots in eight states by late 2000, to only 21 sales lots in approximately three states by early 2007. As the market decreased, H&S was forced to close its worse performing lots throughout the southeast. As closings continued, and downsizing continued, H&S closed its last sales lot in Alabama during 2003. The closing of the last lot in Alabama occurred long before any of these Defendants made any of the claims asserted in their arbitration demands.

Sales associated with H&S will account for only a miniscule part of the estimated $99 million of gross sales that Horton Homes expects for its 2007 fiscal year which ends in August 2007.  Instead, essentially all of those $99 million in sales will be generated by the independently owned dealers that have always sold the great majority of Horton Homes' inventory during its 37 years of existence.

Unfortunately for Horton Homes, its efforts with respect to H&S have proven to be a costly mistake.  Plaintiff Horton is owed approximately $14.4 million on notes related to funds borrowed by H&S.

III.   **ARGUMENT AND CITATION OF AUTHORITIES.**

A.   **The Court Should Enjoin Defendants from Attempting to Arbitrate Against Plaintiff Horton Pursuant to the Defendants' Arbitration Agreements.**

This Court has jurisdiction to hear motions seeking injunctions in arbitration cases governed by the FAA.  *See Frontier Bank v. R & L Trucking Co., Inc.*, No. 3:05-CV-901-F, 2005 WL 2654038, at *1 (M.D. Ala. Oct. 17, 2005) (Fuller, J.).  In such cases, Courts apply the "four-prong test for evaluating a request for a preliminary injunction" that has been established by the Eleventh Circuit.  *Id.* Accordingly, Plaintiff Horton must make the following showing in order to obtain the preliminary injunction that it seeks:

(1)   a substantial likelihood of success on the merits;

(2)   a substantial threat of irreparable injury if the preliminary injunction is not granted;

    (3)    that the threatened injury to the movant outweighs the threatened harm that the injunction may cause the opposing party; and

    (4)    that granting preliminary injunctive relief is not adverse to the public interest.

*Digitel Corp. v. Deltacom, Inc.*, 953 F. Supp. 1486, 1495 (M.D. Ala. 1996) (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991)).  As explained below, Plaintiff Horton is entitled to a preliminary injunction because it can satisfy all four prongs of this test.

### B.  <u>Plaintiff Horton Has a Substantial Likelihood of Success on the Merits</u>.

Plaintiff Horton filed this case to enjoin Defendants from attempting to arbitrate with Plaintiff Horton pursuant to Defendants' Arbitration Agreements. Plaintiff Horton has a substantial likelihood of success on the merits.  Pursuant to the express terms of the Defendants' Arbitration Agreements, the Defendants' Arbitrations are governed by the FAA.  The FAA requires a party to submit to arbitration only if a party has agreed in writing to arbitrate a specific issue. Defendants have failed to provide any arbitration agreement signed by Horton Homes whereby Horton Homes has agreed to arbitrate *any* issue with Defendants. Furthermore, governing authority clearly indicates that determinations of threshold issues concerning arbitrability are to be decided by a court and not an arbitrator.

In addition, Defendants will not be able to overcome the absence of an arbitration agreement signed by Horton Homes, based on an alter ego theory. Defendants have the ultimate burden of proof on this issue and have only summarily raised their alter ego argument by mentioning it without elaboration in their Answer.   Under controlling authorities discussed below, the facts do not justify a finding that Horton Homes is subject to any arbitration agreements as an alter ego of H&S.

<div align="center">

**1.**    **Plaintiff Horton Is Not A Proper Party to Any Arbitration Filed Pursuant to Defendants' Arbitration Agreements Because Plaintiff Horton Has Not Agreed to Arbitrate with Defendants.**

</div>

a)    <u>The Federal Arbitration Act Governs This Matter Because It Concerns Attempted Arbitration of Contracts That Involve Interstate Commerce.</u>

The FAA applies in diversity cases that concern the possible arbitration of contracts involving interstate commerce.   *See, e.g., Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)).  In the instant case, Plaintiff Horton is seeking to enjoin arbitrations that involve contracts for the sale of manufactured homes that were built by Plaintiff Horton at its Eatonton, Georgia, plant and subsequently purchased and sold by H&S to Defendants at sales lots located in Alabama.  Accordingly, each of the Defendants' Arbitration Agreements

specifies that each agreement concerns a transaction in interstate commerce and shall be governed by the FAA.

   b)   **Defendants Cannot Force Plaintiff Horton to Arbitrate Because Plaintiff Horton Has Not Agreed to Arbitrate with Defendants.**

As explained below, the FAA requires a party to have a signed arbitration agreement before a party can be compelled to participate in an arbitration. This is a question of "arbitrability" that is properly determined only by this Court, rather than any arbitrator. Furthermore, a determination of arbitrability by this Court is necessary because Horton Homes has a Seventh Amendment right to a jury trial with respect to certain issues of arbitrability. As further explained below, Horton Homes has preserved its right to contest arbitrability throughout Defendants' Arbitrations, because Horton Homes has consistently objected to its inclusion in those arbitrations.

   i)   **The Federal Arbitration Act Requires a Written Arbitration Agreement.**

Although the FAA favors arbitration, it does not require a party to participate in arbitration unless a party has agreed, in writing, to arbitrate a particular issue. Accordingly, the FAA speaks only of the validity and enforcement of "written agreements" to arbitrate. 9 U.S.C. §§ 2, 4. As this Court has held, "[w]hile federal policy favors arbitration, 'arbitration is a matter of contract and ***a party cannot be required to submit to arbitration any dispute***

- 18 -

*which he has not agreed so to submit*'".  *Battels v. Sears Nat'l Bank*, 365 F. Supp. 2d 1205, 1211 (M.D. Ala. 2005) (emphasis added) (quoting *United Steel Workers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  As the Supreme Court has explained, "[t]his axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration".  *AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648-49 (1986).

The Eleventh Circuit has held that "[s]imply put, parties cannot be forced to arbitrate when they have not agreed to do so".  *Wheat First Secs. v. Green*, 993 F.2d 814, 818 (11th Cir. 1993).  Although courts "generally should apply ordinary state-law principles governing contract formation" in deciding whether a party has agreed to arbitrate a particular issue, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995), *"when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration . . . there is no presumptively valid general contract which would trigger the District Court's duty to compel arbitration pursuant to the [FAA]"*.  *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992) (emphasis added).  *See also Wheat First Secs., Inc.*, 993 F.2d at 817-19.

Therefore, because it is undisputed that Horton Homes is not a signatory to any of the Defendants' Arbitration Agreements, the Defendants' Arbitration

Agreements are presumptively invalid as to Horton Homes. Because Defendants rely entirely on the Defendants' Arbitration Agreements as the sole basis for arbitration with Horton Homes, none of the Defendants has a valid basis to compel Horton Homes to participate in any arbitration. Defendants have not alleged and cannot prove that Plaintiff Horton has signed *any* agreement to arbitrate with them.

Applying these principles to a nearly identical factual scenario involving Alabama law, this Court recently held that a signatory to an arbitration agreement cannot compel a non-signatory to arbitrate its claims or defenses against the signatory. *Thomas v. Redman Manufactured Homes, Inc.*, 244 F. Supp. 2d 1295, 1296-97 (M.D. Ala. 2003) (Albritton, C.J.). In *Thomas*, the plaintiff purchased a manufactured home from a retailer and effected the purchase with a contract that included an arbitration agreement. The manufacturer of the home was a separate corporate entity from the retailer and was not a party to the arbitration agreement between the plaintiff/customer and the retailer. Under these facts, Chief Judge Albritton held that the signatories to the arbitration agreement concerning the sale of the manufactured home could *not* require the manufacturer of the home to participate in arbitration, because the manufacturer was not a signatory to the arbitration agreement. *Id.* In reaching this decision, Chief Judge Albritton relied on a recent Alabama Supreme Court case, which also held that a non-signatory to an arbitration agreement concerning the sale of a manufactured home is not subject

to arbitration filed pursuant to that agreement.  *Id.*  (citing *Ex Parte Tony's Towing, Inc.*, 825 So. 2d 96 (Ala. 2002)).  This Court's recent holding in *Thomas*, as well as the Alabama Supreme Court's decision in *Tony's Towing, Inc.*, show that Horton Homes is not subject to arbitration pursuant to the Defendants' Arbitration Agreements, because Horton Homes is not a signatory to any of those agreements.

ii) <u>Threshold Determinations of Arbitrability Must Be Decided by This Court, Not by an Arbitrator</u>.

Although Defendants have attempted to file arbitrations against Plaintiff Horton, it is for this Court, rather than an arbitrator, to decide the threshold issue of arbitrability:   whether Plaintiff Horton agreed to participate in arbitration with Defendants, pursuant to the Defendants' Arbitration Agreements.[7]   Therefore, Defendants cannot properly argue that an arbitrator should decide the threshold issue of arbitrability, instead of this Court.

---

[7]   The importance of having a court, rather than an arbitrator, determine issues of arbitrability is evident from courts' willingness to enjoin contested arbitrations to prevent the possibility of an arbitrator determining arbitrability.  For example, the Third Circuit has found that the harm to a party would be "*per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority".  *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 515 (3d Cir. 1990) (emphasis added), *overruled on other grounds*, *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002).  The irreparable harm from having an arbitrator determine the arbitrability of Defendants' Arbitrations is discussed in detail below, in Section III.C.

Citing controlling Supreme Court authority, this Court has held that "[i]ssues to be decided by the Court include certain gateway matters, such as whether the parties have a valid arbitration agreement at all, or whether a concededly binding arbitration clause applies to a certain type of controversy". *Battels*, 365 F. Supp. 2d at 1211 (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 451-53 (2003)). *See also Redmon v. Society & Corp. of Lloyds*, 434 F. Supp. 2d 1211, 1218 (M.D. Ala. 2006) (same). Therefore, arbitrability "is undeniably an issue for judicial determination", unless the parties "clearly and unmistakably provide otherwise". *AT&T Techs., Inc.*, 475 U.S. at 648-49. Accordingly, the Supreme Court has held that "[c]ourts should not assume that the parties agreed to arbitrability unless there is *'clear and unmistakable'* evidence that they did so". *First Options of Chicago, Inc.*, 514 U.S. at 944-45 (emphasis added).

Therefore, Defendants have no basis for arguing that an arbitrator, rather than this Court, should decide the "gateway issue" of whether Defendants can force Plaintiff Horton to arbitrate, pursuant to the Defendants' Arbitration Agreements. Because Defendants cannot point to any agreement whereby Plaintiff Horton agreed to arbitrate any dispute with Defendants, there is literally no evidence that Plaintiff Horton and Defendants have agreed to arbitrate the issue of arbitrability.

iii)    <u>Plaintiff Horton Has Not Waived Its Right to Seek This Court's Determination of Arbitrability</u>.

Defendants cannot credibly argue that Horton Homes has somehow waived its right to have this Court decide arbitrability; Horton Homes has objected to Defendants' Arbitrations throughout its participation in those arbitrations. The Supreme Court and the Eleventh Circuit both hold that a party preserves, rather than waives, its objection to arbitrability by consistently objecting to arbitrability in a disputed arbitration. As explained above in Section II.B., Horton Homes has consistently objected to arbitrability in all of Defendants' Arbitrations.

The Supreme Court has specifically rejected the waiver argument, where a party contesting arbitrability in a judicial proceeding had also raised its objection to arbitrability before the arbitrator. In *First Options of Chicago, Inc.*, the party seeking arbitration argued that the objecting party had waived its objection to arbitrability by contesting arbitrability in the challenged arbitration proceeding. 514 U.S. at 946-47. The Supreme Court disagreed and found to the contrary, holding that the objecting party had simply preserved its right to contest arbitrability in a subsequent judicial proceeding. Specifically, the Supreme Court held that

> merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point. To the contrary, insofar as the [objecting parties] were forcefully objecting to the arbitrators deciding their dispute . . . , one naturally would think

that they did ***not*** want the arbitrators to have binding authority over
them.

*First Options of Chicago, Inc.*, 514 U.S. at 946 (emphasis in original).

Similarly, the Eleventh Circuit has held that a party which consistently
objects to arbitrability in an arbitration proceeding does not waive its right
subsequently to press this same objection to arbitrability before a Court. *Czarina,
L.L.C. v. W. F. Poe Syndicate*, 358 F.3d 1286, 1294 (11th Cir. 2004). *See also
China Minmetals Materials Import & Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d
274, 290 (3d Cir. 2003) (holding that a party "did not waive its objection to [the
arbitrator's] jurisdiction inasmuch as it participated in the arbitration primarily to
argue the forgery/jurisdiction issue and consistently objected to [the arbitrator's]
jurisdiction throughout the proceedings").

The fact that an arbitration hearing occurs or that an arbitrator issues a
decision against a party that participated in an arbitration under protest does not
change the rules. *See, e.g., First Options of Chicago, Inc.*, 514 U.S. at 941, 947-48
(finding no waiver where party participated in an ***entire*** arbitration proceeding
under protest). Consequently, Defendants cannot attempt to distinguish the Shaner
Arbitration, on the grounds that Plaintiff Horton chose to state its objection to
arbitrability at the recent June 5, 2007 arbitration hearing, or that a disputed
arbitration award was entered in that arbitration. Instead, these objections simply
preserved Plaintiff Horton's ability to contest arbitrability in that arbitration.

        iv)      <u>Plaintiff Horton Has a Right to Have a Jury Determine Issues That Affect Arbitrability</u>.

This Court, or a jury empanelled by this Court, must determine arbitrability pursuant to the Defendants' Arbitration Agreements, because Horton Homes has a right to have a jury determine this issue.  As explained below, Horton Homes has a right under the FAA to have a jury decide any contested facts determinative of whether Horton Homes is subject to any arbitration agreement.  Additionally, Horton Homes has a right to have a jury decide any contested facts pertaining to any contention that Horton Homes is bound by Defendants' Arbitration Agreements with H&S, because H&S is alleged to be an instrumentality of Horton Homes.

Under the FAA, a party such as Horton Homes, which opposes arbitration by disputing the existence of a written agreement to arbitrate, has a right to a jury trial on contested facts determinative of the issue of arbitrability.  The FAA states that:

> [i]f the making of the arbitration agreement . . . be in issue, the Court shall proceed summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default . . . the Court shall hear and determine such issue.  Where such an issue is raised, the party alleged to be in default may . . . demand a jury trial of such issue, and upon such demand the Court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.

9 U.S.C. § 4. *See also, e.g., Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980).

Plaintiff Horton contends that no jury trial is necessary on this issue, however, because it is undisputed that there is *no* agreement expressly requiring Plaintiff Horton to submit to any arbitration with Defendants. *See Par-Knit Mills, Inc.*, 636 F.2d at 54 ("[o]nly when there is no genuine issue of fact concerning the formation of the agreement [to arbitrate] should the Court decide as a matter of law that the parties did or did not enter into such an agreement").

Additionally, Plaintiff Horton has a right to have a jury decide Defendants' argument that Plaintiff Horton is subject to Defendants' Arbitration Agreements because H&S Homes is allegedly an instrumentality of Plaintiff Horton.[8] To the extent that Defendants intend to base arbitrability arguments on this instrumentality theory, Plaintiff Horton has a right to have a jury determine this

---

[8]    In each of Defendants' Demands for Arbitration, Defendants allege that H&S Homes is an "instrumentality" of Plaintiff Horton. Although Defendants do not elaborate on this allegation, it appears that Defendants will contend that they should be able to pierce the corporate veil of Horton Homes and make it wholly responsible for the agreements and actions of H&S Homes. While Horton Homes cannot respond to this argument until Defendants actually articulate it, the fact that this is a jury issue further supports the need for this Court to determine the issue of arbitrability with respect to Horton Homes.

claim.  As indicated by controlling authority,[9] veil-piercing issues concerning disregard of corporate form are jury issues.  *See FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 421 (5th Cir. 1980) ("[t]his Court holds that the issue of corporate entity disregard is one for the jury"); *In re Silicone Gel Breast Implants Products Liability Litig.*, 887 F. Supp. 1447, 1452 (N.D. Ala. 1985) ("[o]rdinarily the fact-intensive nature of the issue will require that it be resolved only through a trial").  *See also William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir. 1991) (whether to pierce corporate veil and to disregard corporate form is a "determination usually made by a jury because it is so fact specific"); *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1379 (10th Cir. 1980) (whether to disregard the corporate entity "is a fact question which should ordinarily be submitted to the jury"); *Najran Co. for General Contracting & Trading v. Fleetwood Enters., Inc.*, 659 F. Supp. 1081, 1096 (S.D. Ga. 1986).

> **2.**  **Defendants Cannot Prevail on Their Argument That Plaintiff Horton Is Subject to Any Arbitration Agreements as an Alter Ego of H&S Homes.**

Defendants contend in their Answer, without any elaboration, that Horton Homes is subject to arbitration agreements signed only by H&S, because Horton Homes is the alter ego of H&S.  Although Defendants bear the burden of proof on

---

[9]    Pursuant to *Bonner v. City of Pritchard*, 661 F. 2d 1206 (11th Cir. 1981), decisions of the Fifth Circuit prior to September 30, 1981 are Eleventh Circuit precedent.

this argument and have not, as yet, identified any facts or law supporting this argument, the applicable facts show that Defendants cannot prevail. Therefore, while Plaintiff Horton reserves its right to further address the Defendants' alter ego argument in its reply brief, due on September 13, 2007, Plaintiff Horton explains below why it cannot subject to any arbitration agreement as the alter ego of H&S Homes.

        a)    <u>Because Plaintiff Horton and H&S Are Both Georgia Entities, Georgia Law Controls Defendants' Alter Ego Argument</u>.

Based on controlling authority, whether Defendants can use the doctrine of piercing the corporate veil to disregard the separateness of Horton Homes and H&S Homes will be determined by the law of Georgia, because that is the State of incorporation for both entities. *Jefferson Pilot Broad. Co. v. Hilary & Hogan, Inc.*, 617 F.2d 133, 135 (5th Cir. 1980) (in diversity case involving contractual liability, former Fifth Circuit held that "Alabama courts would look to the law of the incorporating state" to determine which state's law would apply to determine veil-piercing issues).

This is consistent with the law in other jurisdictions, which also determine veil-piercing issues according to the law of an entity's state of incorporation. *See, e.g., Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995). *Kalb, Voorhis & Co. v.*

*Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *Thomas v. Lytle*, 104 F. Supp. 2d 906, 927 (M.D. Tenn. 2000); *Autrey v. 22 Tex. Serv. Inc.*, 79 F. Supp. 2d 735, 740 (S.D. Tex. 2000); *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F. Supp. 740, 774 (E.D. Wis. 1994); *Realmark Inv. Co. v. Am. Fin. Corp.*, 171 B.R. 692, 695 (N.D. Ga. 1994); *In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1014 (Bankr. M.D. Fla. 1990) (applying rule that "veil piercing issue[s] must be resolved with reference to the laws of the state where the corporation is incorporated").

Similarly, the Restatement (Second) of Conflicts of Laws states as follows:

> The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.

Restatement (Second) of Conflicts of Laws § 307 (1971).

        b)    <u>Defendants Bear the Burden of Proof on Their Alter Ego Argument</u>.

The applicable law governing both the arbitrability issues and the alter ego issues raised by Defendants indicates that Defendants bear the burden of proof on their argument that Horton Homes is subject to any arbitration agreement as the alter ego of H&S. Under controlling Eleventh Circuit precedent, "when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration . . . ***there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration*** . . .". *Chastain*, 957

F.2d at 854 (emphasis added).  Therefore, because it is undisputed that Plaintiff Horton is ***not*** a signatory to any of the Defendants' Arbitration Agreements, it is presumed that the Defendants' Arbitration Agreements are invalid as to Horton Homes.  Consequently, the onus is on Defendants to overcome this presumption of invalidity, through their alter ego theory or otherwise.

Similarly, under Georgia law on the issue of alter ego, the party seeking to pierce the corporate veil of an entity has the burden of proof to show that a court should pierce the corporate veil.  *Nat Katz & Assocs., Ltd. v. Barber*, 255 Ga. App. 207, 208-09 (2002); *W.R. Leasing, Inc. v. Aetna Cas. & Sur.*, 211 Ga. App. 818, 819 (1994).

<div style="margin-left:2em">

c)     <u>Under the Facts, Defendants Cannot Pierce the Corporate Veil by Making Plaintiff Horton Liable as the Alter Ego of H&S Homes</u>.

i)     <u>Georgia Law Mandates Great Caution in Disregarding Corporate Entity Existence</u>.

</div>

Because the law allows the creation of corporate entities for the express purpose of insulating their shareholders or other owners from liability for corporate acts or debts, Georgia Courts are very reluctant to disregard an entity by piercing the corporate veil.

Georgia Courts have long held that "[t]he law of corporations is founded on the legal principle that each corporation is a separate entity, distinct and apart from its stockholders".  *Hickman v. Hyzer*, 261 Ga. 38, 39 (1991) (citing *Exchange Bank*

*of Macon v. Macon Constr. Co.*, 97 Ga. 1 (1895)).  Georgia Courts also recognize that "[a]n inherent purpose of incorporation is insulation from liability. . . . so that the operation of a corporate business does not render officers and shareholders personally liable for corporate acts".  *Derbyshire v. United Builders Supplies, Inc.*, 194 Ga. App. 840, 844 (1990).

Further, under Georgia law, it does not matter for purposes of piercing the corporate veil, whether a corporate entity is owned by natural persons or by a parent corporation.  Therefore, Georgia Courts recognize that, "so long as the law authorizes the formation of subservient corporations, the law would defeat its own purpose by disregarding its own creature merely because a parent corporation, or other sole owner, controls the subsidiary, . . . and uses it and controls it to promote his or its ends".  *Molly Pitcher Canning Co. v. Central of Ga. Ry. Co.*, 149 Ga. App. 5, 14 (1979) (citations omitted).

Based on these well-established principles of corporate law, Georgia Courts state that ***"great caution should be exercised by the court" in disregarding a corporate entity's status as separate from its owners.***  *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 305-07 (1991) (quoting *Amason v. Whitehead*, 186 Ga. App. 320, 321-22 (1988)) (emphasis added).  *See also, e.g., Farmers Warehouse of Pelham, Inc. v. Collins*, 220 Ga. 141, 150 (1964).

    ii) <u>Georgia Courts Apply a Specific Standard When</u>
      <u>Determining Whether to Pierce the Corporate Veil</u>
      <u>in Response to an Alter Ego Claim</u>.

The Georgia Supreme Court recently stated the longstanding test under Georgia law "to disregard the corporate entity because a corporation is a mere alter ego or business conduit of a person". *Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 289 (2005). Specifically, the Georgia Supreme Court stated that:

> [t]o prevail based upon this theory ***it is necessary to show that the shareholders disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such a unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist***.

*Id.* at 289-90 (citations omitted) (emphasis added). Further, in meeting this burden,

> [p]laintiff ***must*** show that the defendant disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control.

*Id.* at 290 (emphasis added) (citations omitted). This statement of Georgia law is consistent with previous application of Georgia law by the Eleventh Circuit in *United States v. Fid. Capital Corp.*, 920 F. 2d 827, 836-40 (11th Cir. 1991).

Georgia Courts apply this standard with the understanding that the purpose of veil-piercing under Georgia law is "to remedy injustices which arise where a party has overextended his privilege in the use of a corporate entity in order to

defeat justice, perpetuate fraud or to evade contractual or tort responsibility".

*Baillie Lumber Co.*, 279 Ga. at 289-90 (citations omitted).

> iii)    Under Georgia Law and the Facts of This Case,
>         Defendants Cannot Hold Plaintiff Horton Liable as
>         the Alter Ego of H&S Homes.

Based on the facts described above in Section II.C of this Brief, and the Georgia law on alter ego described in Section III.B.2., Defendants cannot meet their burden of proving that Horton Homes is liable as the alter ego of H&S. Defendants must show that Horton Homes intentionally disregarded the separateness of H&S by commingling or confusing the two entities; however, the facts here show that Horton Homes and H&S dealt at arm's length and always formally recognized the separate existence of each other.

***First***, Georgia law is clear that a party seeking to pierce the corporate veil "***must***" show that the owner of an entity "disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records, or control". *Baillie Lumber Co.*, 279 Ga. at 290 (emphasis added). Defendants cannot meet this required showing because Horton Homes did not commingle its assets with those of H&S. Instead, Horton Homes and H&S each maintained its own separate financial records, each independently owned assets and paid its expenses, and each always accounted for intercorporate loans between the two of them. Georgia Courts have specifically

held that intercorporate loans do not justify veil-piercing, so long as such loans are carried on the books of both entities. *See, e.g., Fid. Capital Corp.*, 920 F.2d at 838 ("an entry on the corporate books is a sufficient formality, under Georgia law, for an intercorporate loan"); *Stewart Bros., Inc. v. Allen*, 189 Ga. App. 816, 816-17 (1989).

Similarly, Defendants cannot gain ground by pointing to the limited extent that H&S used employees or office space of Horton Homes, because all such use was accounted for, such that H&S was charged an allocated portion of these expenses. As with intercorporate loans, the shared use of offices, stationery, employees, and a common business address, all do not require a finding that one entity is the alter ego of another. *See, e.g., Fid. Capital Corp.*, 920 F.2d at 839; *Ciprotti v. United Inns, Inc.*, 209 Ga. App. 457, 458 (1993).

Nor can Defendants claim that Horton Homes is the alter ego of H&S, simply because a member of Horton Homes' management was also a manager at H&S Homes. Despite this commonality, H&S Homes at all times made its own decisions through its own management. Accordingly, Georgia Courts have routinely held that having common or shared corporate officers is not a basis for veil-piercing. *See Infrasource, Inc. v. Hahn Yalena Corp.*, 272 Ga. App. 703, 706 (2005); *See Ciprotti*, 209 Ga. App. at 458; *Boafo v. Hosp. Corp. of Am.*, 177 Ga. App. 75, 75-76 (1995).

*Second*, Georgia law on alter ego requires a showing of such common interest and control between the two entities that the subordinate entity was "a mere instrumentality" for the transaction of the superior entity's affairs and that "there is such a unity of ownership and interest that the separate personalities of the corporation and the owners no longer exist". *Baillie Lumber Co.*, 279 Ga. at 289-90.

Defendants also cannot satisfy this showing required for their alter ego claim because Horton Homes demonstrably respected the separateness of H&S. Horton Homes existed on its own long before the creation of H&S Homes in 1996 and has continued on its own in the same form since the demise of H&S. Further, Horton Homes created H&S by joining with a third party in what turned out to be an unsuccessful foray into the retail dealership side of the manufactured home sales. As such, H&S was a separate entity created with another party in order to perform a retail function different from the manufacturing business that Horton Homes has always done.

The fact that H&S sold manufactured homes built by Plaintiff Horton does not somehow make H&S the alter ego of Plaintiff Horton. Instead, Georgia Courts recognize that "[a] parent/subsidiary relationship does not in and of itself establish the subsidiary as the alter ego of the parent". *Kissun v. Humana, Inc.*, 267 Ga. 419, 421-22 (1997). Furthermore, this result does not change even where the sole

owner of an entity "uses and controls it to promote his ends". *Derbyshire*, 194 Ga. App. at 844. *See also Amason*, 186 Ga. App. at 322; *Molly Pitcher Canning Co.*, 149 Ga. App. at 14.

Consequently, the fact that H&S ultimately became a wholly owned subsidiary of Horton Homes which sold homes manufactured by Horton Homes does not make H&S the alter ego of Horton Homes. Instead, such a relationship is entirely valid under Georgia law, provided that Horton Homes respected the separateness of H&S, which it did.

**Third**, Defendants cannot show that their alter ego claim satisfies the purpose of veil-piercing under Georgia law, which is "to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity *in order to defeat justice, perpetrate fraud or to evade contractual or tort responsibility*". *Baillie Lumber Co.*, 279 Ga. at 290 (emphasis added).

In the instant case, Defendants cannot show the requisite injustice, fraud or evasion of responsibility. Rather than serving as an improper conduit of money or other assets to Plaintiff Horton, H&S was instead a failed venture to which Horton Homes loaned millions of dollars, most of which will never be repaid to Horton Homes. In addition, H&S' business difficulties occurred because of an unfortunate but legitimate reason – a severe and continuing market downturn that adversely affected the entire manufactured home industry, rather than any illegitimate reason.

C.     **There Is a Substantial Threat of Irreparable Injury to Plaintiff Horton If the Preliminary Injunction Is Not Granted.**

Plaintiff Horton has satisfied the second factor for a preliminary injunction because it is subject to the irreparable harm of having to participate in an improper arbitration proceeding, if the requested preliminary injunction is not granted. For example, proceeding with such an arbitration could subject Plaintiff Horton to liability, as well as possibly tainting it with improper findings of fact or of law, which could adversely and improperly affect Plaintiff Horton in other legal proceedings. Furthermore, participation in such an arbitration could cause Plaintiff Horton to forfeit constitutional rights to jury trial that it would otherwise have, and which it is attempting to preserve by filing the instant action in this Court.

Indeed, Plaintiff Horton's Second Amended Complaint demonstrates exactly this type of irreparable injury. Despite Plaintiff Horton's objections to arbitration, Defendant Shaner obtained an arbitration award against Plaintiff Horton on July 6, 2007. Plaintiff Horton is now being forced to appeal this Arbitration Award to prevent the Award from becoming *res judicata,* even though the Arbitrator was *without* jurisdiction to enter the arbitration award against Plaintiff Horton.

These concerns are valid and substantial, as numerous other courts have found in deciding to enjoin arbitration proceedings in which one party raised the

threshold issue of arbitrability.  In fact, the Third Circuit has found the irreparable

harm from such a situation to be "obvious", as follows:

> *we think it obvious that the harm to a party would be per se irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority.*  Even if such things could be known in advance, it would be irrelevant whether the arbitrator's determination would be the same as the court's.  A reluctant party has a right to a judicial determination of his obligation to arbitrate. We hold, therefore, that the district court did not abuse its discretion or commit an error of law in determining that [the party contesting arbitration] would suffer irreparable harm if it were forced to submit to the arbitrator's jurisdiction, if even just for a determination of the scope of that jurisdiction.

*PaineWebber Inc.*, 921 F.2d at 515 (emphasis added).  The Eighth and Ninth

Circuits similarly have found irreparable harm from failure to enjoin an arbitration

in which a party has contested arbitrability.  *See McLaughlin Gormley King Co. v.*

*Terminix Int'l Co.*, 105 F.3d 1192, 1194 (8th Cir. 1997) ("If a court has concluded

that a dispute is non-arbitrable, prior cases uniformly hold that the party urging

arbitration may be enjoined from pursuing what would now be a futile arbitration,

even if the threatened irreparable injury to the other party is only the cost of

defending the arbitration and having the court set aside any unfavorable award".);

*Textile Unlimited, Inc. v. A.B.M.H. & Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001)

(affirming district court's finding that party opposing arbitration "would suffer

irreparable harm if the arbitration were not stayed").

**D.    The Threatened Injury to Plaintiff Horton from Allowing the Arbitrations to Proceed Outweighs the Threatened Harm That the Injunction May Cause to Defendants.**

Whereas Plaintiff Horton will likely be subjected to the irreparable harm described above if it is required to participate in the Defendants' Arbitrations, Defendants will not be similarly prejudiced by the entry of a preliminary injunction that will allow this Court to exercise its obligation to determine arbitrability.  In comparison to the real and judicially recognized irreparable harm described above, Defendants can only point to delay as alleged harm caused by having to wait for this Court to adjudicate arbitrability.  Accordingly, Courts have routinely held that this "balancing of harms" analysis justifies entry of a preliminary injunction in cases where a party is objecting to arbitrability.  *See, e.g., Dean Witter Reynolds, Inc. v. Goyette*, 25 F. Supp. 2d 1344, 1346 (M.D. Fla. 1996).  *See also Textile Unlimited, Inc.*, 240 F.3d at 786 (granting preliminary injunction); *McLaughlin Gormley King Co.*, 105 F.3d at 1194 (same).

**E.    Granting Preliminary Injunctive Relief in This Case Is Not Adverse to the Public Interest.**

As common sense would suggest, "granting a preliminary injunction [against a challenged arbitration] does not disserve the public interest because the public has no interest in compelling arbitration of claims which the parties agreed are not subject to arbitration".  *Dean Witter Reynolds, Inc.*, 25 F. Supp. 2d at 1346 (citing *AT&T Techs., Inc.*, 475 U.S. at 648-49).  *See also Textile Unlimited, Inc.*, 240 F.3d

at 786 (finding "that it was in the public interest to stay arbitration").  *Accord*

*Gruntal & Co., Inc. v. Steinberg*, 854 F. Supp. 324, 342 (D.N.J. 1994) (holding that

"public interest" concerns did not "significantly affect[]" a court's preliminary

injunction analysis in granting successful motion to enjoin arbitration proceedings

where party contested arbitrability).  Therefore, there is no public interest that

mitigates against entry of the preliminary injunction against the Defendants'

Arbitrations, as requested herein.

## IV.    <u>CONCLUSION</u>.

For the reasons stated above, the Court should grant Plaintiff Horton's

Motion to Enjoin Arbitrations and enter a preliminary injunction against any

attempt by the Defendants to make Plaintiff Horton participate in, or in any way be

subject to, any arbitration filed pursuant to any of the Defendants' Arbitration

Agreements.

Dated this 23rd day of August, 2007.

*[Signature of Counsel on Following Page]*

By: _____*s/ Jimmy L. Paul*_____

JIMMY L. PAUL
*Georgia Bar No. 567600*
THOMAS C. GRANT
*Georgia Bar No. 297455*
(Admitted *Pro Hac Vice*)

*Co-counsel for Plaintiff Horton Homes, Inc.*

*Chamberlain, Hrdlicka, White, Williams & Martin*
191 Peachtree Street, N.E. – Thirty-Fourth Floor
Atlanta, Georgia 30303
(404) 659-1410
(404) 659-1852 (facsimile)
james.paul@chamberlainlaw.com

SYDNEY F. FRAZIER *(FRA007)*

*Cabaniss, Johnston, Gardner, Dumas & O'Neal, LLP*
Suite 700
2001 Park Place North
Birmingham, Alabama  35203
(205) 716-5291
(205) 716-5389 (facsimile)
sff@cabaniss.com

*Co-counsel for Plaintiff Horton Homes, Inc.*

254042.1
730302-000000:6/10/2007

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date the undersigned has filed using the CM/ECF system a true and correct copy of "**Plaintiff Horton Homes, Inc.'s Brief In Support of Its Motion for Preliminary Injunction Against Defendants' Arbitrations**" and has served by CM/ECF system and United States Certified Mail Return Receipt Requested the following:

<u>CMRRR #70010710000493716541</u>
Randy A. Myers
Frank Hawthorne, Jr.
Hawthorne & Myers LLC
322 Alabama Street
Montgomery, Alabama  36104

<u>CMRRR #70010710000493716550</u>
Michael S. Harper
Michael S. Harper, P.C.
PO Box 78068
Tallassee, Alabama  36078

Dated this <u>23rd</u> day of August, 2007.

By: ____*s/ Jimmy L. Paul*_____
JIMMY L. PAUL
*Georgia Bar No. 567600*
THOMAS C. GRANT
*Georgia Bar No. 297455*
(Admitted *Pro Hac Vice*)

*Co-counsel for Plaintiff Horton Homes, Inc.*

*Chamberlain, Hrdlicka, White, Williams & Martin*
191 Peachtree Street, N.E. – Thirty-Fourth Floor
Atlanta, Georgia 30303
(404) 659-1410
(404) 659-1852 (Facsimile)
james.paul@chamberlainlaw.com

254042.1
730302-000067:8/23/2007