**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**


**HORTON HOMES, INC.**

      **PLAINTIFF**


**VS.**                                        **2:07-cv-506-MEF**


**LARUE BANDY, ET. AL.,**

      **DEFENDANTS**


**<u>DESIGNATION OF EVIDENCE SUPPORTING MOTION TO COMPEL DEPOSITION
OF TRIANGLE HOMES REPRESENTATIVES</u>**


      Come now the Defendants herein, who designate the following deposition testimony in support of their Motion to Compel the depositions of representatives and officers of Triangle Homes, Inc:


    1.      Deposition of Dudley Horton, pages: 4, 9-19, 66-96, 111-117, 124-125.


    2.      Deposition of Horton Homes Corporate Representative: 3, 11.

MICHAEL S. HARPER,
A PROFESSIONAL CORPORATION

213 Barnett Boulevard                    /s/ Michael S. Harper
Post Office Box 780608                   MICHAEL S. HARPER - HAR094
Tallassee, Alabama 36078                 Attorney for Defendant
Telephone:      334-283-6855
Fax:            334-283-6858

OF COUNSEL:

Frank H. Hawthorne, Jr.
Randy A. Myers
Hawthorne & Myers, L.L.C.
322 Alabama Street
Montgomery, Alabama 36104
Telephone: 334/269-5010

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 30th day of July, 2008, filed the above document electronically with the CM/ECF E-Filing System in Federal District Court. The below counsel will receive a copy from the system via e-mail if registered in the system. If not, I certify that I have placed a copy of the same in the U.S. Mail this day to:

Sydney F. Frazier, Jr., Esquire
Cabaniss, Johnston, Gardner, Dumas & O'Neal, LLP
2001 Park Place North, Suite 700
Birmingham, Alabama 35203

James L. Paul, Esquire
Thomas C. Grant, Esquire
Chamberlin, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E., 34th Floor
Atlanta, Georgia 30303

/s/ Michael S. Harper
OF COUNSEL

# DEPOSITION

# OF

# DUDLEY HORTON

N. Dudley Horton, Jr.            5/21/08

---

─ SHEET 1    PAGE 1 ─

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

HORTON HOMES, INC.,           :
                              :
        Plaintiff            :
                              :
                              : CIVIL ACTION NO.
   vs.                        :
                              : 2:07-CV-506(MEF)
LARUE BANDY, MARIE BANDY,     :
PATRICK PRITCHETT, WILLIAM    :
SHANER, ELSIE FONDREN AVERETTE,:
WILLIAM CRUTHERDS, and SHERRIE :
CRUTHERDS,                    :
                              :
        Defendants.          :

─────────────────────────────

MACON, GEORGIA    9:00 A. M.    MAY 21, 2008

   The deposition of N. DUDLEY HORTON, JR. is being taken by the Defendants; testimony is given before Jeweldine Johnston, Georgia Certified Court Reporter A-89, in the offices of Hall, Bloch, Garland & Meyer, Suite 1500, 577 Mulberry Street, Macon, Georgia, on May 21, 2008, beginning at approximately 9:00 a. m.

─────────────────────────────

─ PAGE 2 ─
APPEARANCES:

For the Plaintiff:      MR. SYDNEY F. FRAZIER, JR.
                        Cabaniss, Johnston, Gardner,
                           Dumas & O'Neal, LLP
                        Park Place Tower, Suite 700
                        2001 Park Place North
                        Birmingham, Alabama  35203

                        MR. JAMES L. PAUL
                        Chamberlain Hrdlicka
                        191 Peachtree Street, N.E.
                        Thirty-fourth Floor
                        Atlanta, Georgia  30303-1747

For the Defendants:     MR. FRANK H. HAWTHORNE, JR.
                        MR. RANDY MYERS
                        Hawthorne & Myers, L.L.C.
                        322 Alabama Street
                        Montgomery, Alabama  36104

                        MR. MICHAEL HARPER
                        P. O. Box 780608
                        Tallassee, Alabama  36078

                        MR. F. KENNEDY HALL
                        Hall, Bloch, Garland & Meyer, LLP
                        577 Mulberry Street, Suite 1500
                        Macon, Georgia 31208

Also present: Ms. Chris Brooks, Videographer

─ PAGE 3 ─
STIPULATIONS:

        MR. MYERS:    We are going to have what I call the usual stipulations is that there will be no objections, except as to form.  We'll save the objections for trial.  Also, Mr. Horton has the right to read and sign.  I assume y'all -- are y'all going to instruct him to read and sign?
        MR. PAUL:    Yes, we are.  I'd say the objections are reserved until time of trial, except to the form of the question.  I don't agree that I won't object to anything, so we'll just have to see what the questions are.
        MR. MYERS:    That's fine.
        MR. HARPER:    No objections to the videographer and court reporter and the deposition's won't be filed.
        MR. PAUL:    No objection as to the videographer or court reporter and the depositions will be filed when used.
        Could we get on the record whether this is the 30(b)(6) deposition or the individual one?
        MR. MYERS:    Individual first.

─────────────────────────────

─ PAGE 4 ─
1              N. DUDLEY HORTON, JR.
2         having first been duly sworn by the
3            court reporter, testified on
4               CROSS-EXAMINATION
5  BY MR. MYERS:
6   Q    Would you state your name for the record, please?
7   A    Nevils Dudley Horton, Jr.
8   Q    Where do you live, Mr. Horton?
9   A    Eatonton, Georgia.
10  Q    How long have you lived in Eatonton?
11  A    All my life.
12  Q    How old are you?
13  A    74.
14  Q    Are you married?
15  A    Yes.
16  Q    How long have you been married?
17  A    My first wife died with cancer and I remarried, and
18 I've been married 10 years.
19  Q    Do you have any children?
20  A    Yes.
21  Q    What are their names and ages?
22  A    Thomas, which is 20, who's a stepson, and Rob,
23 Robert Dudley Horton who's 15.
24  Q    Have you ever given a deposition before?
25  A    Yes.

---

Court Reporting Associates, Inc.            (478) 742-1459

N. Dudley Horton, Jr.          5/21/08

SHEET 3   PAGE 9

```
 1      Q    Yes, sir.
 2      A    It was -- we agreed that we would change the name at
 3 the conclusion of our fiscal year when we had the audit and
 4 we'd have the audit before it actually changed names.
 5      Q    Was that your sole employment and business in 1972
 6 or '3, was Horton Homes, Inc. or did you have any other
 7 business interests?
 8      A    Well, I still had Horton Development Corporation and
 9 my dad and I had Double Six Gas and Oil.
10      Q    What was Double Six Gas and Oil?
11      A    It was a Phillips 66 distributorship.
12      Q    When was Horton Industries, Inc. developed?
13      MR. PAUL:   Is the question when was it formed?
14      MR. MYERS:      Q    When was it formed?
15      A    Approximately 20 years ago, but I couldn't tell you
16 the exact date.
17      Q    What was the reason for forming Horton Industries,
18 Inc.?
19      A    Well, the accountants and the lawyers thought it
20 would be a good situation to have a holding company for the
21 various entities.
22      Q    When Horton Industries, Inc. was formed, you say it
23 was formed as a holding company?
24      A    Yes, sir.
25      Q    What companies were part of Horton Industries, Inc.
```

PAGE 11

```
 1 trustee of that trust?
 2      A    N. D. Horton, Jr., I am.
 3      Q    N. D. Horton Revocable Trust, who is the trustee of
 4 that?
 5      A    N. D. Horton, Jr.
 6      Q    And how is N. D. Horton, Jr. kin to you?
 7      A    I am N. D. Horton, Jr.  That's my initials, which I
 8 go by because my first --
 9      Q    Okay.  N. D., I'm sorry.
10      A    -- my first name is Nevils and it's kind of hard to
11 deal with.
12      Q    I understand.  And what percentage of Horton
13 Industries, Inc. does Maude H. Hicks Family Trust have?
14      A    It's 50 some odd percent.  It's more than 51
15 percent.  I don't remember whether it's 53, 54 percent,
16 somewhere in that neighborhood.
17      Q    And the N. D. Horton, Jr. Revocable Trust, how much
18 does it own?
19      A    Somewhere in the neighborhood of 35 percent.
20      Q    Mr. Weeks?
21      A    I think he owns three percent.
22      Q    Mr. Sinclair?
23      A    Three percent.  They own the same amount.  I don't
24 remember.
25      Q    And who is the trustee of the Robert W. Dudley
```

PAGE 10

```
 1 back when it was formed in approximately 1987?
 2      A    Well, Horton Homes was one of them.  Associated
 3 Dealers, Inc. was one.  I think RJ&J Enterprises was one of the
 4 initial companies.
 5      Q    What did Associate -- is it Associate Dealers, Inc.;
 6 is that --
 7      A    Associated Dealers, Inc.
 8      Q    What did that company do?
 9      A    It was the retail manufactured housing business.  It
10 had some retail lots that we operated as Deerwood Mobile Homes,
11 Inc.
12      Q    Would it sell exclusively Horton Homes, Inc.?
13      A    No, sir.  It sold other manufacturers' products,
14 also.
15      Q    When Horton Industries, Inc. was formed, who were
16 the stockholders of the company?
17      A    I don't remember that, sir.
18      Q    Do you know who they are now?
19      A    I think I could name them.  I could name most of
20 them.
21      Q    All right, sir.
22      A    Maude H. Hicks Family Trust, the N. D. Horton, Jr.
23 Revocable Trust, William I. Weeks, Steven M. Sinclair, and the
24 Robert Dudley Horton Trust.  I think that's them.
25      Q    On the Maude H. Hicks Family Trust, who is the
```

PAGE 12

```
 1 Horton Trust?
 2      A    N. D. Horton, Jr.
 3      Q    And it owns the rest of the percentage, whatever
 4 that is?
 5      A    Yes, sir.
 6      Q    Now, today, tell me, if you can, the different
 7 companies that Horton Industries, Inc. has an ownership
 8 interest in.
 9      A    That Horton Industries has an ownership in?
10      Q    Correct.
11      A    Of course, it owns Horton Homes, Inc.
12      Q    It's the sole owner of Horton Homes, Inc.?
13      A    Yes, sir.  It owns Associated Dealers, Inc.
14      Q    And Associated Dealers, Inc., is it still in
15 business selling retail?
16      A    It's not active, but it still exists.
17      Q    When was the last time it was active?
18      A    Oh, probably the early '90s.
19      Q    What other companies?
20      A    RJ&J Enterprises, Inc.
21      Q    What kind of company is that?
22      A    It's more in real estate than anything else.
23      Q    Does Horton Industries, Inc. own 100 percent of
24 RJ&J?
25      A    Yes, sir.
```

Court Reporting Associates, Inc.          (478) 742-1459

N. Dudley Horton, Jr.          5/21/08

**SHEET 4  PAGE 13**

```
1   Q   100 percent of Associated Dealers, Inc.?
2   A   Yes, sir.
3   Q   What other companies?
4   A   Best Value Housing, Inc.
5   Q   Best Value?
6   A   Yes, sir.
7   Q   Does Horton Industries 100 percent of that company?
8   A   Yes, sir.
9   Q   What does that company do?
10  A   Well, it was in the retail manufactured housing
11  business in the early and mid '90s, and we decided that -- for
12  the second time that we didn't want to be in the retail
13  manufactured housing business and we had two lots, one in
14  Milledgeville, Georgia and one in Gainesville, Florida, and we
15  made the decision to get out of retail and closed the lot in
16  Gainesville, Florida and sold the one in Milledgeville.
17  Q   But Best Value Housing, Inc. is still a viable
18  company?
19  A   Yes, sir.
20  Q   It doesn't do anything?
21  MR. PAUL:    By viable, let's be sure he knows
22  what you --
23  MR. MYERS:    Active.
24  THE WITNESS:    A    Well, it still has a few
25  subdivision lots that it had, you know, as a result of being in
```

**PAGE 14**

```
1   the manufactured housing retail business and still has the real
2   estate from the location in Milledgeville.  We sold the
3   business and leased the lot to Sinclair Oconee Homes.
4   MR. MYERS:    Q    What other companies?
5   A   Horton Vans, Inc.
6   Q   What does that company do?
7   A   We manufacture cargo haulers and equipment haulers.
8   Q   Is that company still active?
9   A   Yes, sir.
10  Q   What other companies?
11  A   Could you read me back the ones that I've named?
12  Q   There's Horton Homes, Inc., Associated Dealers,
13  Inc., RJ&J, Best Value Housing, Inc., Horton Vans, Inc.
14  A   Dynasty Homes, Inc.
15  Q   What does Dynasty Homes, Inc. do?
16  A   It manufactures a line of houses that competes with
17  Horton Homes.
18  Q   How long has it been in business?
19  A   A long time.  I would say approximately 20 years.
20  Q   Is it still active?
21  A   Yes, sir.
22  Q   Where is it located?
23  A   Eatonton, Georgia.
24  Q   Is it the same location as Horton Homes, Inc.?
25  A   Yes, sir.
```

**PAGE 15**

```
1   Q   Just different named house?
2   A   Yes, sir.
3   Q   What other companies?
4   A   Triangle Homes.
5   Q   What kind of company is it?
6   A   Retail manufactured housing.
7   Q   Is it still active?
8   A   Yes, sir.
9   Q   When was it formed?
10  A   It's two or three years old.
11  Q   Does it have lots that it sells retail manufactured
12  homes on?
13  A   It has subsidiaries that have lots, yes, sir.
14  Q   What's the subsidiary?
15  A   Regal Homes, which operates in Georgia, and Beacon
16  Homes, which I think is in South Carolina, and New Generation
17  Homes, which is in North Carolina.
18  Q   Does Triangle Homes and its subsidiaries just sell
19  Horton Homes?
20  A   Yes, sir.
21  Q   Approximately how many lots do they have?
22  A   Just Triangle with the three subsidiaries?
23  Q   Yes, sir.
24  A   Approximately 20 lots.
25  Q   Were any of these lots formerly with H & S Homes?
```

**PAGE 16**

```
1   A   Yes, sir.
2   Q   How did these lots get from H & S Homes to these
3   subsidiaries of Triangle Homes?
4   A   The assets were auctioned off at public auction and
5   they bought some of them and landlords bought some and they
6   leased them to Regal Homes or Beacon Homes or New Generation
7   Homes.
8   Q   Did you say landlords bought some of them?
9   A   Yes, sir.
10  Q   What is that?
11  A   Well, some different landlords.
12  Q   So, there were public auctions of H & S Homes at
13  some point in time?
14  A   Yes, sir.
15  Q   When did those occur?
16  A   Somewhere during the winding down of H & S Homes.  I
17  would say it was in the last two years.
18  Q   And the money obtained from these auctions, where
19  did that go?
20  A   Depending on if H & S owned the offices and the
21  equipment, it went to H & S Homes and was paid to liquidate
22  that debt.
23  Q   Liquidate what debt?
24  A   The debt that they owed to their suppliers, their
25  subcontractors, painters, brick masons.
```

N. Dudley Horton, Jr.        5/21/08

SHEET 5    PAGE 17

```
 1     Q    Any of it go to liquidate any debt to Horton Homes?
 2     A    Yes, sir.
 3     Q    How much?
 4     A    I don't know, sir.  The records show how the money
 5  was spent, but I don't know how much of it went to that.
 6     Q    There's some testimony that was approximately 14
 7  million; is that about right?
 8          MR. PAUL:    My objection to the question is
 9     there's no identification of that testimony and I am
10     not aware of any testimony about 14 million paid out,
11     so if you can show it to me.
12          MR. MYERS:    It's on page 114 of the
13     transcript that was taken at the preliminary
14     injunction hearing in this case where you were asking
15     questions of Mr. Hicks, where it says:  Except for
16     Horton, how much was left that went to Horton when it
17     was said and done, talking about all the payment to
18     all the creditors.  It was a little over 14 million.
19          MR. PAUL:    Okay.
20          MR. MYERS:    Are you satisfied?
21          MR. PAUL:    You can look at the words and see.
22     I am not satisfied that that's necessarily the intent
23     of the testimony, but you can read the words.  Just
24     ask Mr. Horton the question.
25          MR. MYERS:    Well, I did, but you said you
```

PAGE 18

```
 1     didn't know of any testimony and I showed you what the
 2     testimony was.
 3          MR. PAUL:    Yeah, I see what you're pointing
 4     to, and I see how you got to your construction of it,
 5     yes, sir.  So, he can answer the question, if he can.
 6          MR. MYERS:    Q    Was it approximately 14
 7  million dollars that Horton got after all the creditors were
 8  paid?
 9     A    I don't know that.
10     Q    Who would know that?
11     A    Well, the books would show it or the accountants
12  would know it.
13     Q    But who -- what accountants would know that?
14     A    Well, the Christian, Thigpen and Kelly, the people
15  that do our annual audit, or Steve Sinclair could determine
16  what it was.  I'm just not that familiar with the exact number.
17     Q    Let's get back to the different companies that
18  Horton Industries, Inc. has ownership interest in.
19          Now, all the companies that you have mentioned so
20  far, are all those companies 100 percent owned by Horton
21  Industries, Inc.?
22          MR. PAUL:    He's already testified that
23     Triangle owns the three subsidiaries, so they're not
24     directly owned, but go ahead.
25          THE WITNESS:    A    I think every company that
```

PAGE 19

```
 1  we named is 100 percent owned by Horton Industries.  There's a
 2  lot of them.
 3          MR. MYERS:    Q    Is there a list someplace
 4  that you have?
 5     A    Yes.
 6     Q    Do you know of any other companies off the top of
 7  your head that Horton Industries, Inc. has got an interest in,
 8  ownership interest in?
 9     A    No, sir.
10     Q    I'm going to go through some companies that I've got
11  some names from other depositions and just ask you about them.
12     A    Yes, sir.
13     Q    New Mortgage Corporation.
14     A    New Mortgage Corporation's owned 100 percent by
15  Horton Industries Inc.  I didn't intentionally leave it out,
16  and not having a list to go by and not knowing I was going to
17  be questioned on Horton Industries, I --
18     Q    And I don't fault you on that, I'm just asking what
19  your knowledge is on these things.
20     A    Yes, sir.
21     Q    What does New Mortgage Corporation do?
22     A    It provides some floor plan for dealers and also
23  assists in getting mortgages for dealers on houses and land
24  that they are selling to the customer.
25     Q    How long has that company been in business?  And I'm
```

PAGE 20

```
 1  not asking exact date; I just wanted an estimate.
 2     A    It's over 10 years.  I couldn't tell you exactly how
 3  long it has been.
 4     Q    Did it supply any financing to H & S?
 5     A    None other than what it did to any other dealer.  I
 6  mean it may have arranged some permanent loans for customers of
 7  H & S.
 8     Q    What about floor plans, I mean did it provide floor
 9  plans for any --
10     A    No, sir.
11     Q    It's a habit of a lot of us to answer the question
12  before because you anticipate what I'm going to ask, but if
13  you'd let me get it out -- I'm slow sometimes, but I'll finally
14  get it out -- I'd appreciate it.  Let me get the question out
15  before you answer it and I'll try not to interrupt you.
16     A    Yes, sir.
17     Q    Another company is Horton Automotive?
18     A    Yes, sir.
19     Q    Is it owned by Horton Industries, Inc.
20     A    Horton Industries has no ownership interest in
21  Horton Automotive.
22     Q    Who owns that company?
23     A    I own a portion of it and different members of the
24  Horton family owns portions of it.
25     Q    What does Horton Automotive do?
```

N. Dudley Horton, Jr.     5/21/08

SHEET 17   PAGE 65

1  without Norton Homes, Inc. signing the repurchase agreement?
2    A    In my opinion, they couldn't.
3    Q    Where is Textron located; do you know?
4    A    It's in Vermont.  I'm not sure what city in Vermont
5  it's in.
6    Q    I'm going to say this wrong, but Bombardier?
7    A    Yes, sir.
8    Q    Is that -- where is that located?
9    A    Bombardier?
10   Q    Yes, sir.
11   A    It thought that was the question you just asked me.
12   Q    I thought I asked you about Textron.
13         MR. PAUL:    He had you looking at 17 Exhibit,
14   which is Bombardier, but he asked you about Textron,
15   which is Exhibit 15.
16         THE WITNESS:     A    Excuse me.  I misunderstood
17   your question.  I thought I was answering to Bombardier.
18   Bombardier is located in Burlington and I don't know where
19   Textron's headquartered.
20         MR. MYERS:    Q    Other than Bombardier and
21   Textron, did H & S use any other financing companies for floor
22   planning?
23    A    Yes, sir.  They used G.E., General Electric
24   Commercial Lending.
25    Q    Anybody else?

PAGE 66

1    A    I think that was it.
2    Q    Did H & S acquire any lots from the previous retail
3  businesses that Horton Industries, Inc. had?
4    A    No, sir.
5    Q    You had mentioned a company a while ago, Triangle.
6  Who's the president of Triangle?
7    A    I don't know.
8    Q    Do you know who are on the Board of Directors?
9    A    No, sir.
10   Q    Do you know any of the officers of the company?
11   A    I'm sure I do, but I don't know what office they
12  hold.
13   Q    You've got names, but you just don't know which
14  office they hold?
15   A    Uh-huh.
16   Q    What are the names?
17   A    Dave Giddens.
18   Q    Anybody else?
19   A    That's the only one I can think of right now.
20   Q    Has Steve Sinclair got any dealings or any kind of
21  employment or officer holding or whatever for Triangle?
22   A    Not to my knowledge.
23   Q    Does he do any accounting work for them?
24   A    No, sir.
25   Q    Now, when you changed the name of the LLC to H & S

PAGE 67

1  Homes, LLC, its sole purpose was to sell manufactured homes; is
2  that correct?
3    A    Well, to sell them and to set them up and to service
4  them, deliver them, finance them.
5    Q    So, H & S Homes actually financed mobile homes that
6  were purchased?
7    A    You had to arrange the financing.  If you don't have
8  some way to arrange financing, you're not going to do too well
9  in retail sales.
10   Q    Would they arrange financing with any of the
11  companies that Horton Industries had an interest in?
12   A    No, sir.
13   Q    Why not?
14   A    Well, we don't long-term finance residential
15  property.  Most of the -- well, I say most of it, a large
16  percentage of manufactured housing paper now is sold to FHA,
17  the Federal Housing Administration.
18   Q    Now, did -- from the time that the company started
19  being called H & S Homes, LLC, did Horton Homes, Inc. put any
20  money into the company, other than through loaning it money?
21   A    No, sir, we loaned them money.
22   Q    When Horton Homes, Inc. loaned money to H & S Homes,
23  LLC, was a note always drawn up for the loan?
24   A    It was supposed to be, yes, sir.
25   Q    The first note that was produced to us is dated

PAGE 68

1  8-31-98 and it's Bates stamped Horton -- when I say the first
2  note, the first dated note that we got from Horton Homes --
3  from H & S -- it says H & S Housing to Horton Homes, Inc., is
4  dated 8-31-98.  Is H & S Housing the same as H & S Homes, LLC?
5    A    It's just a mistake, if it's saying Housing, yes,
6  sir.
7         MR. MYERS:    I'm going to get this marked as a
8    composite exhibit, No. 18.
9         MR. PAUL:    Okay.
10        MR. MYERS:    I'm going to get this stapled
11   right quick and then I'll give it to you.
12        MR. MYERS:    Q    I'm going to show you Exhibit
13   18, which is a composite of a note and two checks, and let you
14   look at that.
15   A    Yes, sir.
16   Q    Do you recognize those documents?
17   A    Yes, sir.
18   Q    Tell us what those are.
19   A    It's a note to Horton Homes from H & S in the amount
20  of $6,328.
21   Q    How much?
22   A    Six million.  Excuse me.  A bigger figure than I'm
23  used to reading.  $6,328,710, dated August 31st, '98.
24   Q    All right.  What's the next document?
25   A    Looks like a check from H & S Homes, LLC to Horton

N. Dudley Horton, Jr.          5/21/08

SHEET 18    PAGE 69

1  Homes, Inc., dated 9-25-98 in the amount of $6,328,710.
2     Q    What is the next document?
3     A    It's the back of a check where Horton Homes
4  deposited the H & S check to its account.
5     Q    And the next document?
6     A    It's a check from Horton Homes, Inc., dated -- I
7  believe that's 9-25-98 -- in the amount of $6,328,710 and a
8  copy of the back of the check where it was deposited to H & S
9  Homes' account.
10    Q    What was the purpose of that transaction?
11    A    Hadn't been but 10 years ago, has it?
12    Q    Well, I mean can you give me an explanation of why
13 there's a note in August for $6,328,710, the first check we see
14 with that amount on it is dated 9-25-1998.
15    A    I would say that Horton Homes' fiscal year ends
16 August 31st, and that we probably combined some notes to make
17 this amount.  Then on the 25th of September, when Horton Homes
18 loans H & S that same amount of money, that the auditors
19 probably wanted to refer to this as long-term debt, if it went
20 over a year old, and they refer to it as short-term debt, if it
21 was in a year, so H & S paid Horton Homes the amount of the
22 note and Horton Homes turned around and loaned H & S the amount
23 of the loan back, would be what I would think happened.
24    Q    And you say your best guess is the auditors told you
25 to do that?

PAGE 70

1     MR. PAUL:    I don't think that's what
2  he said.
3     THE WITNESS:    A    Well, they may not have
4  told us to do it, but if it's over a year old, then it goes as
5  a long-term debt, instead of a short-term debt.
6     MR. MYERS:    Q    What's that got to do with
7  anything?
8     A    If you've ever borrowed any money, you know very
9  well the difference between a long-term debt and a short-term
10 debt and the creditors look at it pretty hard.  They like
11 short-term stuff.
12    Q    So, this was -- in order to make the creditors of
13 Horton Homes, Inc. look at this as a short-term rather than a
14 long-term debt?
15    A    That it was a short-term receivable, as far as
16 Horton Homes was concerned, rather than a long-term receivable.
17    Q    Well, why was the note done on August 31?
18    A    It's the end of our fiscal year and we just combined
19 them, would be my thinking on it.
20    Q    You combined what?
21    A    A bunch of smaller notes that H & S had.
22    Q    Well, that's the first note I've --
23    A    Well, maybe it was the first money they borrowed,
24 but I --
25    Q    How did it combine notes that are not in existence?

PAGE 71

1  We've asked for all the notes.  That's the first dated note
2  that we've gotten.
3     A    Well, if they had seven notes that made up
4  $6,328,700, when they gave them the new note, I would think
5  that they tore up the old notes.
6     Q    So, is that a -- is that what your company does, is
7  when a note's consolidated or renewed, the other notes are tore
8  up?
9     A    I don't know.  I wouldn't think both of them --
10    Q    We've got a big stack of notes where my
11 understanding is some of them are consolidation notes and some
12 of them renewals and the old ones are not tore up that I've
13 seen.
14    MR. PAUL:    Excuse me. I object to the
15 question because it's a summary of knowledge the
16 lawyer has, so I move to strike the statements
17 and put the question --
18    MR. MYERS:    I was trying to put the question.
19 I was telling him what I've seen and I'm going to ask
20 him to see if he can justify it.
21    MR. PAUL:    Well, it's not a matter of
22 justifying it.  I mean he can tell you what he knows,
23 but --
24    MR. MYERS:    Q    Well, do you know that Horton
25 Homes, Inc. tears up notes that have been paid?

PAGE 72

1     A    I don't know whether they tear them up, give them to
2  who it was paid by or shred them or what they do, but -- I
3  don't know how that's handled.
4     Q    Who would know that?
5     A    I would think that Steve Sinclair or Christian,
6  Kelly and Thigpen, the auditors.
7     Q    Did your auditors often give you advice to issue
8  checks and notes in order to make things appear differently to
9  creditors?
10    A    They don't appear differently.
11    MR. PAUL:    I object to the form of the
12 question.
13    THE WITNESS:    A    That wasn't any of the
14 purpose of doing it.  H & S could have at one time gone out and
15 borrowed the money and it was a demand note, and if you notice,
16 all those notes are drawn on demand, which is a current
17 obligation that were not meant to be long-term debt.  We didn't
18 intend to not get our money back for sure and we certainly
19 thought that we'd get it back quickly.
20    MR. MYERS:    Q    You say all those notes are
21 demand notes.  I don't have any notes before that date.
22    A    Well, whatever notes you've got are drawn on demand.
23    Q    Was there some kind of company decision to start
24 keeping notes after this particular date?
25    A    No, sir.  And I don't know where those notes are.

Court Reporting Associates, Inc.          (478) 742-1459

N. Dudley Horton, Jr.          5/21/08

SHEET 19   PAGE 73

1  You may have them, as far as I know.
2      Q     I may have them?
3      A     Yes, sir. We've sent you a lot of stuff.
4      Q     Well, I can give you all the notes that I've --
5  we've gotten. If you can show me those notes, I'll let you
6  look through there and show me any notes before that date. You
7  want to try to do that?
8      A     I don't have any desire to do it, but I don't know
9  that you don't have them.
10     Q     Your company has produced to us all the notes.
11     A     Sir?
12     Q     Pardon me?
13     A     I didn't understand you.
14     Q     Has you company produced to us all the notes that we
15 asked for?
16     A     To the best of my knowledge, we have. We haven't
17 tried to withhold anything from you. You know more about us
18 than we know about ourselves.
19     Q     Well, is that because you loosely handle the
20 business between these companies?
21     A     No, sir, it does not.
22           MR. PAUL:     Excuse me. I object to the
23     question and move to strike because it's an
24     argumentative question.
25           MR. MYERS:     You can move all you want, but

PAGE 75

1      Q     That's what I'm asking. I mean there should be;
2  right?
3      A     Yes, sir.
4      Q     Because this would not be capitalization of the
5  company, this would be loans to the company, H & S?
6      A     That's correct.
7      Q     And we've added all these checks up from 5-12-97
8  down to 9-25-98, the six million dollar check?
9      A     Yes, sir.
10     Q     And I want to show you Exhibit 17, which is our
11 tabulation of it. Do you see that?
12     A     Yes, sir.
13     Q     What we did is we took each amount of these checks
14 and added them up from 5-12-97 down to 9-25-98 and it comes up
15 to five million and some odd dollars; right?
16     A     Yes, five and a half million dollars by this.
17     Q     Now, why was this check on 9-25-98 for six million
18 dollars, if the checks that had been issued only add up to five
19 and a half million dollars, if that check was for the purpose
20 of showing short-term debt?
21           MR. PAUL:     Before you answer the question,
22     let me object to the form of the question in that it
23     contains mostly statements by counsel of things
24     counsel has apparently done for whatever reason that
25     is clearly outside Mr. Horton's knowledge, so I object

PAGE 74

1      you can answer the question, if you can.
2           THE WITNESS:     A     Well, we certainly are not
3  a loosely run outfit. We try to have records of what we do and
4  each company stands on its own bottom and is supposed to pay
5  its debts and obligations and we've always been, with the good
6  Lord's help, able to do that.
7           MR. MYERS:     Q     We have also received some
8  checks from Horton Homes to H & S Homes and we've got a summary
9  of them that we composed. It's been marked as Exhibit No. 4 to
10 a previous deposition, and I'm going to let you look at that
11 exhibit.
12     A     Yes, sir.
13     Q     Now, on this particular exhibit, and I'll represent
14 to you it's our documentation of the checks that were provided
15 to us from Horton Homes to H & S Homes. Did you ever loan any
16 money to H & S Homes that was not supported by a check?
17     A     No, sir.
18     Q     Now, we've got the date of the check here starting
19 5-12-97 and then we've got this check that we've already talked
20 about dated 9-25-98 down here, the six million dollar check.
21     A     Yes, sir.
22     Q     And then we've got a bunch of checks in between
23 there, but we don't have any notes for them. Should there be
24 a --
25     A     There should be a note for each one of those.

PAGE 76

1      to the form of the question.
2           If you know the answer to the actual question he
3      asked, you can answer it.
4           THE WITNESS:     A     I couldn't tell you that,
5  and if you say you don't have these checks --
6           MR. MYERS:     Q     No, I do have those checks, I
7  don't have the notes.
8      A     Don't have the notes.
9      Q     And you're referring to these --
10     A     Yes, sir.
11     Q     -- you're talking about --
12     A     Yes, sir.
13     Q     -- from 5-12-97 through 9-25-98?
14     A     Yes, sir. You have the checks?
15     Q     Right.
16     A     But don't have the notes?
17     Q     Correct.
18     A     I don't know. They should tally up, if my
19 assumption is what they did on 9-25-98 is correct.
20     Q     Well, let me show you what's been marked as
21 Defendant's Exhibit No. 5. Do you recognize what that is?
22     A     Yes.
23     Q     And what is that?
24     A     It looks like a general ledger from Horton Homes
25 book on H & S Homes.

N. Dudley Horton, Jr.          5/21/08

### SHEET 20   PAGE 77

```
1    Q    What does it show the balance owed on 8-31?
2    A    On 8-31?
3    Q    Yes, sir.
4    A    What year is that?
5    Q    I'm sorry, 1997.  That first page.
6    A    It looks like to me it shows that the balance is
7  64,564 -- $64,554,060.99.
8    Q    I'm going up to '97.  On 8-31-1997, what does it
9  show?  You see you've got a date up here, '97, and you've got a
10 date down here '98?
11   A    On 7-31?
12   Q    On 8-31-1997, what does it show as being owed?
13        MR. PAUL:    I object to the form of the
14 question because there are actually two 8-31 entries
15 and it's not clear to me what you're talking about.
16        MR. MYERS:    Well, I'm talking -- that's the
17 reason I've asked him the question.
18        MR. PAUL:    Well, I mean, but -- so, I object
19 to the form when you don't tell him which entry you're
20 talking about for 8-31.
21        MR. MYERS:  Q    Do you know why there would
22 be two entries for 8-31-1997?
23   A    I see one entry for '97 and one entry for -- wait a
24 minute.  Wait a minute.  I see where you are now.  8-31.  I
25 have no idea, unless you went back to that Ledger 2 and Ledger
```

### PAGE 78

```
1  3 to see where those figures came from, but apparently, they
2  posted two entries to it on 8-31.
3    Q    But as of 8-31-1997, there's one entry that's got a
4  balance there of 14 million dollars; right?
5    A    Yes, sir.
6    Q    With the checks that we've gotten through 8-25-97,
7  you can look at those, 100,000, 100,000, 50 and 22,000,
8  $272,000.  Now, why does this show a --
9    A    I couldn't tell you that.  You'd have to ask the
10 bookkeeper.  It's a very valid question, though.
11   Q    And then we go down to 8-31 of '98 where I've
12 already mentioned that we had checks that total 5,522,000, and
13 what does it show the last balance on 8-31-98 as being?
14        MR. PAUL:    Read that question back, please.
15        (The question was read back by the court
16 reporter.)
17        THE WITNESS:    A    I couldn't help you on
18 that.  Without looking back to these ledgers where they're
19 posted from, I wouldn't have any idea.
20        MR. MYERS:    Q    I thought this was your
21 ledger.
22   A    But it shows where it was posted from, Ledger D2 and
23 E3 and F2, as to where they come from as to how they get these
24 numbers.  I don't have any idea how those numbers are gotten.
25   Q    These numbers on Exhibit No. 5 under the column
```

### PAGE 79

```
1  FOLIO, are you saying that's where they got these particular
2  numbers?
3    A    I would think that that's where the number came
4  from.  Now, I'm not an accountant and I didn't keep these
5  books, but I would think that where -- she's got that number
6  there, that that tells where she made -- why she made that
7  debit or credit to the general ledger, and without looking at
8  those, I couldn't give you any idea.
9    Q    Do you know what the symbols stand for, like J2 and
10 K2 and L2, A1?
11   A    I'm not nearly as capable as you think I am.  No,
12 sir, I don't have any idea.
13   Q    I'm just asking.  I mean have you never looked at
14 these before and asked that question of your company?
15   A    To be perfectly honest, I've never asked where D2
16 came from, or G1 as a code there.  That's one of the reasons we
17 use certified public accountants to do our audit.  We have an
18 annual audit for them to check and see if the accountants are
19 doing what they're supposed to do.
20   Q    And then you see this ledger entry here.
21        MR. PAUL:    Excuse me.  Which ledger entry now
22 are we talking about?
23        MR. MYERS:    The '98.
24        MR. PAUL:    What date?
25        MR. MYERS:    Well, if you'd let me ask my
```

### PAGE 80

```
1  question, I'll tell you.
2        MR. MYERS:    Q    On this ledger that we've got
3  where it says:  9-30-98, you see that?
4    A    9-30-98?
5    Q    It's on the second page of the ledger.
6    A    Yes, sir.
7    Q    Now, above that, it's got 8-31-98 and it's got a
8  balance of 6,455,460; is that correct?
9    A    Yes. sir.
10   Q    And then it's got the two check entries that we've
11 already talked about; is that correct?
12   A    Yes.
13   Q    And then the balance stays the same?
14   A    Yes.
15   Q    And does that help you at all in explaining why this
16 was done?
17        MR. PAUL:    Excuse me.  I object to the form
18 of the question.  Why this was done is not going to be
19 clear, what is being asked here.
20        MR. MYERS:    Q    Well, why this was done would
21 be issuing two checks the same day, one from Horton Homes to
22 H & S and one from H & S to Horton Homes that this ledger entry
23 shows.  I mean does this help you explain why that was done?
24   A    No, sir.
25   Q    Let me show you Defendant's Exhibit No. 20, which is
```

N. Dudley Horton, Jr.        5/21/08

**SHEET 21   PAGE 81**

1  two checks, both from H & S Homes, LLC to Horton Homes, Inc.,
2  both dated 8-31-06.  I'll just let you look at it and I'm going
3  to ask you a question after you get through looking at it.
4      You ready?
5      A    Yes, sir.
6      Q    Do you know why there would be two checks dated the
7  same day, same amount, made from H & S Homes, LLC to Horton
8  Homes, Inc.?
9      A    I would assume they were making a payment on what
10 they owed Horton Homes, but I don't have any knowledge of that,
11 but that would be the only reason I could see it.  And maybe
12 they got a wire in on the last day of our fiscal year that they
13 wrote one of the checks in the morning and then H & S got some
14 additional money wired in from one of the flooring sources and
15 they wrote another check, but I don't have any idea.
16     Q    H & S got money from the flooring sources for what?
17     A    Well, if the house was retail sold, whoever handled
18 it generally sends the money to the flooring source and the
19 flooring source takes what they are owed on that house and the
20 rest of the money comes on to H & S.
21         MR. MYERS:    Let me have this marked as
22 Exhibit 21.
23         MR. MYERS:    Q    Let me show you what's been
24 marked as Defendant's Exhibit No. 21, which is two checks, both
25 from H & S Homes, LLC, dated the same date for the same amount

**PAGE 82**

1  of $5,500,000.  Would your explanation for those two checks be
2  the same?
3         MR. PAUL:    I object to the form of the
4      question because the same will not be clear.
5         MR. MYERS:    Q    The same as what you
6      testified about the reason for the other two checks that were
7  dated the same day that were sequential for $850,000?
8      A    I don't have any idea as to why the two checks were
9  written on the same date for the same amount of money.
10     Q    Going back to this six million dollar note --
11     A    Yes, sir.
12     Q    If that is a consolidation note -- is that what
13 you're testifying you think that was?
14     A    That would be what I would think it was.
15     Q    Why would a check be issued that day?
16     A    To --
17     Q    Not that day, but a month later?
18     A    What do you mean a month later?
19     Q    Well, that --
20     A    Why would they pay it?  They paid the note a month
21 later.
22     Q    The consolidation note, they paid it off?
23     A    Well, that's what the check says.  Now, I can't tell
24 you I remember 12 years ago.
25         MR. MYERS:    Why don't we break for lunch?

**PAGE 83**

1         (The deposition was recessed and resumed.)
2         MR. MYERS:    Q    Mr. Horton, from the time
3  that H & S was formed, was it ever profitable?
4         MR. PAUL:    My objection is can we get a
5      definition of profitable or either let the witness
6      define his understanding, one or the other.
7         MR. MYERS:    All right.
8         MR. MYERS:    Q    Do you understand what
9  profitable means?
10        MR. PAUL:    My objection is it means a lot of
11     different things.
12        MR. MYERS:    I'm going to get his definition,
13     if he says yes.
14        THE WITNESS:    A    Did it have an operating
15 profit before depreciation and interest?  Yes, sir.  It was not
16 a very successful operation and we were never able to generate
17 -- with the declining conditions that were taking place in the
18 manufactured housing industry nationwide, able to generate the
19 number of sales per location to make it a profitable -- highly
20 profitable venture.  It did make money some months, some months
21 it lost a little money.
22        MR. MYERS:    Q    On a yearly basis, would it
23 make -- did it -- was there ever a year where it made more
24 money than it lost?
25        MR. PAUL:    My objection again is that we're

**PAGE 84**

1  talking about operating profit or what are we talking
2  about?
3         MR. MYERS:    Operating profit.
4         THE WITNESS:    A    If you looked at operating
5  profit, yes, sir, we were successful in making money --
6         MR. MYERS:    Q    Do you remember what years
7  that was?
8      A    No, sir.
9      Q    If it was making money, why was it having to borrow
10 money from Horton Homes?
11     A    Well, initially, we were in an expansion mode, as we
12 got somewhere between 8 and 12 locations from the Douglases
13 when we split up with them.  And then we continued to open
14 locations, thinking that business was recovering and going to
15 continue to recover, and instead of business recovering, it
16 continued to decline nationwide and it's continued to do so.
17 The industry's gone from selling like 300,000 units a year to
18 where it's selling less than 100,000 units a year now, and
19 Fleetwood has gotten out of the retail end of the manufactured
20 housing market.  So has Champion Homes, two of our bigger and
21 larger competitors.
22     Q    So, was H & S borrowing money from Horton Homes to
23 open new lots; is that what you're saying?
24     A    Yes, sir.  We went up to -- from 8 to 12 lots up
25 into the low 50s before it finally dawned on us that maybe it

N. Dudley Horton, Jr.        5/21/08

SHEET 22   PAGE 85

PAGE 85

1 was going to take longer to come back than we thought and so
2 then we started closing the lots that were not generating
3 enough revenue to make money and continued to downsize it.
4        Q     When did that start?
5        A     I would say in probably the 2001 or maybe even 2000,
6 2002.
7        Q     Did H & S Homes get any kind of break from Horton
8 Homes or Dynasty on the cost of purchasing a home wholesale?
9        A     We sold H & S just like they were an independent
10 dealer with Horton Homes or Dynasty.  We did that for two
11 reasons.  Number-one, we never envisioned H & S taking more
12 than 25 percent of Horton Homes' production and really didn't
13 want them to get quite that high.  And the independent dealers
14 would have put up a pretty loud hue and cry had we had a
15 different scenario.  We actually favored the independent dealer
16 over the company-owned store and if there was a company-owned
17 store and an independent dealer of Horton Homes wanted to buy
18 that location, we worked with them to try to sell them that
19 location and not have a company-owned store there any more.
20       Q     When you say company-owned store, you're talking
21 about H & S?
22       A     Yes.
23       Q     So, Horton would work with an independent dealer to
24 sell the independent dealer an H & S lot, if they wanted it?
25       A     Well, of course, Horton Homes couldn't sell it to

PAGE 86

1 them, we would tell H & S that we would prefer they sell that
2 location and --
3        Q     Right, and H & S is going to do what you tell them
4 to do, aren't they?
5        A     I hope so.
6        Q     I mean you were the chairman of the Board of H & S.
7        A     There's no question that, you know, they listened to
8 what I said and there's no question in hindsight that I made a
9 mistake not to have downsized it quicker than we did, but we
10 kept thinking that business was going to turn and the economy
11 going to pick up and that manufactured housing would come back.
12 They went through the debacle with Oakwood Financial and Green
13 Tree and Green Point buying paper on the retail customer in
14 manufactured housing that in hindsight shouldn't have been
15 bought.  There's some question as to whether it should have
16 been bought had you looked at it at the front, but no question
17 the number of repossessions and the industry reached one point
18 where we were handling 90,000 repossessions or foreclosures a
19 year in manufactured housing.  Well, that was a significant
20 portion of what had been handled.
21           We thought that once that paper was out of the
22 system that we would continue to produce the number of new
23 houses plus the number of foreclosed houses that had been
24 produced for several years, but it didn't happen that way.  The
25 market continued to decline, and even after the foreclosures

PAGE 87

1 and repossessions were disposed of and the people that were
2 still buying manufactured housing paper were buying it very
3 very close, it never picked back up and has continued
4 to decline even till 2008.  And we thought that when the sub-
5 prime fiasco surfaced with the stick builder and, fortunately
6 or unfortunately, we didn't get to participate in that in
7 manufactured housing.  We thought with that downturn in the
8 site-built or stick-built housing that manufactured housing
9 would rise up, but it has not done that yet.  It's still
10 participating.  As site built goes lower, manufactured housing
11 goes lower, so we still have not seen the pickup in the demand.
12       Q     I appreciate that, but when you said before that you
13 hoped H & S would do what you asked them to do, you knew that
14 they were going to do what you asked them to do; right?
15       A     Well, I guess anybody that's ever worked people or
16 worked with people knows what you expect to happen, but if you
17 are naïve enough to think it's going to happen in every
18 situation, then you're fooling yourself.  I had a supervisor to
19 come in one day and I asked him were they doing something in
20 the plant and he said:  Well, Boss, they're supposed to be
21 doing it.  I said:  I understand that, Chester, but if they
22 were doing what we told them to do, I wouldn't have a job for
23 you.  Your job is to be certain that they're doing what they're
24 supposed to do.
25       Q     And your employees understood that; right?

PAGE 88

1        A     Yes, sir.
2        Q     In other words, if you told them that they needed to
3 be doing something, they were going to do it?
4        A     Going to try to do it.
5        Q     Or you would pretty much tell them we don't need
6 your job?
7        A     Well, there comes a point that if a fellow
8 consistently doesn't do what you do or tell him to do.
9 Sometimes different conditions change situations where it's --
10 you don't want to box yourself into a position, I said I was
11 going to do so-and-so, and the guy was run over by an 18-
12 wheeler and he's laying in the hospital and you had told him if
13 he missed another day, you were going to fire him.  You don't
14 want to get in that position.
15       Q     I understand.  Now, when we got off on your
16 testimony just a minute ago, we were asking about whether or
17 not any breaks was given to H & S by Horton Homes on the sale
18 of manufactured homes and you say no?
19       A     Each salesman has a district and he will have so
20 many dealers in that district.  Some of them will be H & S
21 dealers, some of them will be independent dealers, and he
22 handles each dealer the same, whether he's an H & S dealer or
23 an independent dealer.
24       Q     So, when H & S would buy a mobile home wholesale
25 from Horton, even though H & S started losing money, Horton

N. Dudley Horton, Jr.        5/21/08

SHEET 23    PAGE 89

**PAGE 89**

1  wouldn't reduce the price of that mobile home for H & S, would
2  they?
3      A    No, sir.
4      Q    Because Horton was getting paid by the floor
5  planner?
6      A    That's correct.
7      Q    So, Horton Homes, Inc., even though H & S was losing
8  money, you wouldn't cut them any deals because Horton Homes was
9  getting paid by the floor planner?
10     MR. PAUL:    He's already said why he wasn't
11  cutting deals.
12     THE WITNESS:    A    We wouldn't cut them a deal
13  because it wouldn't be fair to the independent dealer if we
14  were selling our own subsidiary houses at a cheaper price than
15  we would to them.
16     MR. MYERS:    Q    Now, I want to talk to you a
17  little bit more about the ledger, which is Exhibit No. 5.
18     A    Yes, sir.
19     Q    And it shows on here in 2001, 8-31-2001, that the
20  balance of debt for H & S to Horton Homes had gotten up to
21  $39,000,000; is that correct?
22     A    That's the way I read it, yes, sir.
23     Q    Did Horton Homes loan money to any of the other
24  affiliated companies with Horton Homes?
25     A    We would occasionally loan -- you mean like to our

**PAGE 91**

1      Q    Because it's due from affiliated companies and
2  Horton Homes, Inc. didn't owe any money to H & S, did it?
3      A    Well, doesn't it say that Horton Homes is owed the
4  money?
5      Q    It says the company had demand notes receivable of
6  $47,000,000.  It's your company's document.  I'm just asking
7  you.
8      A    Yes, sir.
9      Q    Is that what you understood from this?
10     A    Could I read it?
11     Q    Sure.
12     MR. PAUL:    Mr. Horton, when you get
13  through, let me look at it before you answer.
14     THE WITNESS:    Okay.
15     THE WITNESS:    A    Would you call Horton
16  Industries an affiliated company?  It's the parent company.
17     MR. MYERS:    Q    I don't know.  That's y'all's
18  document.  I don't know who you're talking about.  I mean
19  that's the reason I'm asking.
20     A    If you are -- we had loaned Horton Industries some
21  money, so it could be that the -- and I'm sure the records are
22  there to show that and they've been audited who the money was
23  made up from, but I couldn't look at the document and tell you.
24     Q    Would it be an amount close to seven million
25  dollars?

**PAGE 90**

1  subsidiary, like to Horton Ironworks?
2      A    Right.
3      A    Yes, sir.  We'd occasionally loan Horton Ironworks
4  some money.
5      Q    Up to $10,000,000?
6      A    Oh, I don't think so.  Horton Ironworks is not
7  nearly as big as H & S and wouldn't have needed that kind of
8  money.
9      Q    Did you loan to other affiliates, other than
10  Ironworks, Horton Homes, Inc.?
11     A    I don't think so.
12     Q    Now, we've got a document that are Horton Home
13  audits that was marked as Plaintiff's 21 to -- I believe that
14  was the injunction hearing, and in this audit, it's got notes
15  to consolidated financial statements.
16     A    Yes, sir.
17     Q    It's got a Note No. 12 here that says, and it's on
18  page 16 of this particular audit:  The company had demand notes
19  receivable of $47,000,000 and $38,000,000 on August 31, 2001
20  and 2000, respectively.  And the company is referring to who in
21  your audits?
22     A    Who had those notes?
23     Q    Yes, sir.
24     A    Without studying it, I would think it was referring
25  to Horton Homes.

**PAGE 92**

1      A    That Industries owed Homes?
2      Q    Yeah, right.
3      A    It could be.
4      Q    This appears to say the company had demand notes
5  receivable of $47,530,000 at August 31, 2001; right?
6      A    Yes, sir.
7      Q    And on your ledger here, August 31, 2001, H & S owed
8  39 million, right, according to your ledger?
9      A    Yes, sir.
10     Q    So, there's a difference between that and 39 million
11  and the 47 million that's down here of a little over nine
12  million?
13     A    Yes, sir.
14     Q    And it's your understanding that nine million would
15  be something that would have been a loan to Horton Industries?
16     A    Well, it could have been to Horton Industries or it
17  could have been to Horton Ironworks.
18     Q    But you have no recollection of --
19     A    No, sir.  No.
20     Q    Would there be a similar ledger that you've got here
21  on H & S Homes as to how much was owed?
22     A    Yes, sir.
23     Q    When H & S had gotten up to owing 39 million dollars
24  to Horton, did Horton make a demand on H & S to pay that money?
25     MR. PAUL:    Can we put a time frame on that?

N. Dudley Horton, Jr.          5/21/08

SHEET 24   PAGE 93

```
1     MR. MYERS:    8-31, when they owed them 39
2  million.
3     MR. PAUL:    Of 2002?
4     MR. MYERS:    2001.
5     THE WITNESS:    A    I don't recall specifically
6  doing so.  I know we had several meetings with Steve Sinclair
7  about we had to get that debt down, but we did not make a
8  demand on them at that time.
9     MR. MYERS:    Q    How did he propose to get the
10 debt down?
11    A    Well, to sell more houses and make money and we were
12 also liquidating some locations and, when you liquidate a
13 location, you generally recovered some of the money that you
14 had invested there.
15    Q    So, at that point in time, Horton Homes decided not
16 to make a demand on the 39 million owed?
17    A    I don't know whether we even considered it.
18    Q    Then, in 2004, as of 2-28-2004, how much money did
19 H & S owe to Horton Homes?
20    A    In 2-28-04?
21    Q    yes, sir.
22    A    According to this ledger, they owed them 29 million
23 dollars.
24    Q    I'm going to show you Horton Homes, Inc. and
25 Subsidiaries Consolidated Financial Report of August 31, 2004.
```

PAGE 94

```
1  What does it say that is owed the company, demand notes
2  receivable, at that point in time?
3     MR. PAUL:    Let me see it before you answer,
4     please.  When you say at that point in time, you don't
5     mean February 28th that you just asked about, you mean
6     August 31?
7     MR. MYERS:    Exactly.
8     MR. MYERS:    Q    August 31, 2004, what does it
9  say the company had demand notes receivable at that time?
10    A    The company had demand notes receivable of 18
11 million 943 thousand --
12    Q    Wait, wait, say that again.
13    A    The company had demand notes receivable of
14 $18,943,459.
15    Q    Now, what does your ledger show is owed from H & S
16 Homes on 8-31-04?
17    A    8-31-04?
18    Q    On your ledger.
19    A    24 million 403 thousand.
20    Q    Well, why is there a discrepancy against H & S Homes
21 owing Horton Homes, Inc. 24 million and your audited financial
22 statement saying only 17 million was owed from all the
23 affiliated companies?
24    A    You'd have to ask the auditors, Mr. Christian, Kelly
25 and Thigpen.  I couldn't tell you.
```

PAGE 95

```
1     Q    You don't know what -- any explanation for that?
2     A    No, sir.
3     Q    Had you ever noticed that discrepancy before?
4     MR. PAUL:    I'm going to object to you
5     -- you have misread this question.  Now, it says that
6     17 million is classified as long term; it did not say
7     that's what was outstanding.  The words specifically
8     say of the total notes receivable, amounts
9     outstanding, 17,049,000 are classified as long term.
10    MR. MYERS:    Okay.
11    MR. PAUL:    So, that's not what it is. .That
12    was a misleading question and I object.
13    MR. MYERS:    Well, I apologize for that
14    because that's what Mr. Horton read in as the amount that was
15    owed.  Actually, it says the company had demand notes
16    receivable of 18,943,000 as of August 31, 2004; right?
17    MR. PAUL:    The sentence says:  The company
18    had demand notes receivable of 18,943,459 and
19    22,461,727 at August 31, 2004 and 2003 respectively,
20    due from affiliated companies.
21    MR. MYERS:    Q    So I guess my question should
22 have been why is there a discrepancy between the 18 million
23 shown here and the 24 million shown on your ledger?
24    A    I would suggest you ask Christian, Kelly and
25 Thigpen, the CPAs, because I don't know.
```

PAGE 96

```
1     Q    Should Mr. Sinclair have caught that discrepancy?
2     MR. PAUL:    I object to the form of the
3     question in that it assumes there is a discrepancy or
4     that --
5     MR. MYERS:    There's not a discrepancy between
6     24 million and 18 million dollars?
7     MR. PAUL:    Not based on your question.  I
8     mean that's -- I object to the form of the question
9     that assumes there is a discrepancy.
10    MR. MYERS:    Well, let me ask Mr. Horton
11    MR. MYERS:    Q    This says the company had
12 demand notes receivable of 18,943,459, right, at August 31,
13 2004 due from affiliated companies; correct?
14    A    Yes, sir.
15    Q    And one of those affiliated companies was H & S
16 Homes; right?
17    A    Yes, sir.
18    Q    But your ledger shows that the company had demand
19 notes receivable of over 24 million from H & S alone; right?
20    A    Yes, sir.
21    Q    Isn't that a discrepancy?  Wouldn't you call that a
22 discrepancy?
23    A    Well, it certainly doesn't line up with what this
24 ledger that I have before me says.  I couldn't offer an
25 explanation on it.  I would assume that Christian, Kelly and
```

N. Dudley Horton, Jr.          5/21/08

**SHEET 28  PAGE 109**

```
 1    A    Well, I didn't see any need to hire the attorney.
 2 The notes were there.  We knew they got the money and y'all, no
 3 disrespect to you, but none of y'all work too cheap.
 4    Q    But that was a conversation that y'all had about
 5 hiring an attorney and where it ended up was you said to Mr.
 6 Sinclair, let's just not hire an attorney and --
 7    A    Well, I said I don't see any need in trying to
 8 defend it, Steve, and he said I -- you know --
 9    Q    He wasn't going to buck you, was he?
10    A    Well, hopefully not.
11    Q    Because you're chairman of the Board of that
12 company, N & S; right?
13    A    Yes, sir.
14    Q    And chairman of the Board of Horton?
15    A    Yes, sir.
16    Q    But you were going to let N & S just have a 22
17 million dollar judgment filed against it and have no response
18 to that lawsuit?
19    A    I didn't see that they had any response.  They'd
20 gotten the money and it was a just debt.  I don't know how you
21 would defend it.
22    Q    How did you choose Mr. Briley as the attorney to
23 file it?
24    A    I've known Mr. --
25    MR. PAUL:     Excuse me.  Just so -- I don't
```

**PAGE 110**

```
 1 mind the witness testifying.  In your testimony,
 2    if it involves any discussion with a lawyer, that
 3    is privileged, but -- so I would object.
 4    THE WITNESS:     A    I selected Briley because
 5 I've known him for a long time and he enjoys the reputation as
 6 being a good lawyer and I decided we'd use Mr. Briley.
 7    MR. MYERS:     Q    How many times have you used
 8 him?
 9    A    Over the years?
10    Q    Yes, sir.
11    A    I don't know.
12    Q    More than once?
13    A    I think so, yes, sir.
14    Q    Give me a rough estimate of how many times you've
15 used him as a lawyer.
16    A    I haven't had too much dealings for lawyers.  I
17 haven't hired too many lawyers.
18    Q    More than twice?
19    A    I wouldn't want to say, and this may be the only
20 time he's ever worked for us.  I do not think it is, but --
21    Q    Did he give you a fee up front as to what he would
22 charge?
23    A    I don't recall.
24    Q    Do you know how much he did charge?
25    A    No, sir.
```

**PAGE 111**

```
 1    Q    Would it surprise you that he only charged $150 for
 2 a 22 million dollar lawsuit?
 3    A    I think he was reasonable in his charge.
 4    Q    I'm going to ask you some follow-up questions about
 5 Triangle.  When did the downturn in retail sales of mobile
 6 homes begin?
 7    A    Well, in the -- actually, there was a little
 8 downturn in the late '90s and then it started picking back up
 9 and we actually ran a thousand houses, produced a thousand
10 houses and sold them in the month of August '01, and we thought
11 -- we had produced more houses than that, but there had been a
12 downturn and it looked like it was coming back up and then
13 September 11th came by and I would never have believed that it
14 would've caused -- and it may not be what caused the downturn
15 in manufactured housing, but manufactured housing took a
16 significant downturn in September of '01 and has continued.
17 Now, there have been maybe a month or two that you'd have just
18 a little peak up, you know, not a steady downhill, but if you
19 look back three months, you're lower now than you were three
20 months ago, even though you may have had a little perk up.  I
21 have never seen -- and at times I wonder if we're in the buggy-
22 whip business.  They say since they've been keeping statistics,
23 that buggy-whips are the only thing that never came back.  Most
24 other industries have downturns and then they'll have upturns
25 and generally the upturn will bring you back a little higher
```

**PAGE 112**

```
 1 than it was before, and there were articles being written that
 2 our industry was going to build one out of four housing starts
 3 in America, and we were missed that a lot.
 4    Q    So, the trend started down in 2001?
 5    A    Well, it started back down in 2001.
 6    Q    And it hasn't recovered since?
 7    A    No, sir, no, sir.  No.
 8    Q    Why would one of your companies, Horton Industries,
 9 start a retail business, the Triangle business?
10    A    Well, I'm still of the belief that if we house the
11 average American in affordable houses, it's going to be done in
12 some type factory-built housing.  I have been optimistic since
13 I hit the ground and I still am optimistic.  I sometimes have
14 wondered in the last ten years if I'm off into fooling myself,
15 that the industries not coming back, but -- and -- but I still
16 am reasonably confident, and my nephew who's 40 years old asked
17 me one day in the last ten days, he said:  Uncle Dud, are we in
18 a dying industry?  And I said:  Well, Russ, if we got a bump up
19 out of the disaster with sub-prime lending that the stick
20 builder went through, it sure would have been rough without it.
21 I don't think so.  I think that we are definitely going to have
22 less competition and I think the industry will come back and
23 we'll have five to eight of the best years that this industry's
24 ever known, but I hope I'm not fooling myself and it does come
25 back, but it hasn't yet.
```

Court Reporting Associates, Inc.          (478) 742-1459

N. Dudley Horton, Jr.        5/21/08

SHEET 29  PAGE 113

```
 1    Q    Well, rather than starting up Triangle, why didn't
 2 Horton Homes, Inc. just sell H & S to Horton Industries?
 3    A    Well, number one, Horton Industries didn't want to
 4 buy it and we -- Triangle is a totally different operation from
 5 what H & S was.
 6    Q    Well, why wouldn't Horton Industries want to buy
 7 H & S?  Why wouldn't they want to buy them?
 8    A    Well, we made the decision that we would have three
 9 smaller companies operating.  One in Georgia, one in South
10 Carolina and one in North Carolina would be the only three
11 areas that we would operate in.
12    Q    Well, then I guess the question then is -- I mean
13 did H & S have operations in those states?
14    A    In some of them, yes.
15    Q    Well, rather than selling H & S at an auction and
16 Triangle buying it, why didn't --
17         MR. PAUL:    Excuse me.  There's no testimony
18    that Triangle bought H & S.
19         MR. MYERS:    Bought some of their --
20         MR. PAUL:    There's no testimony about that,
21    so ask him the question.
22         MR. MYERS:    Well, if you'll let me, I will.
23         MR. PAUL:    But there's no -- all right.
24         MR. MYERS:    Well, if you want to testify,
25    testify, but, you know, I'll ask him the question, if
```

PAGE 114

```
 1 you'll let me finish it, I'll get it out of my mouth.
 2         MR. PAUL:    Finish it.
 3         MR. MYERS:    Q    During the time that Triangle
 4 -- after they started, did Triangle or its subsidiaries buy
 5 Horton Homes' assets -- I mean H & S assets?  I'm sorry.
 6    A    Whether they bought any of the assets of H & S?
 7 I don't know, but I don't think so.
 8    Q    I thought you had previously testified that H & S
 9 was selling at auction some of their assets and that these
10 companies under Triangle bought some of those assets?  Did you
11 say that?
12    A    I don't think I testified to that.  I said I think
13 some landlords bought some of the property and then leased them
14 to these other companies.
15    Q    So, you don't think that Triangle or any of its
16 subsidiaries bought at any of these auctions any of H & S'
17 assets?
18    A    I don't think so.  Not to my knowledge, they didn't.
19    Q    Who came up with the idea to start Triangle?
20    A    I don't know.
21    Q    Did somebody come to you with the idea?
22    A    I don't think I came up with the idea.  Now, as to
23 whether Tom Leach came to me with the idea or whether Steve
24 Sinclair came to me with the idea or -- I just don't recall.
25    Q    You mentioned that H & S is -- some of their assets
```

PAGE 115

```
 1 were sold at public auctions.  Was there a particular auction
 2 company that handled these auctions?
 3    A    Yes, sir.
 4    Q    What was the name of that auction company?
 5    A    Hudson & Marshall out of Macon.
 6    Q    Did they exclusively handle the auctions --
 7    A    You mean did --
 8    Q    -- for H & S?
 9    A    Did anybody else --
10    Q    Yes, sir.
11    A    No, sir.  We turned it over to them to sell.
12    Q    Where did these auctions take place?
13    A    I think they had a series of auctions.  I don't
14 think they sold everything at one location.  They moved around
15 from location to location and sold.
16    Q    Do you remember what states?
17    A    Well, I know that we had property in Georgia, or
18 locations in Georgia, Alabama, Tennessee, North and South
19 Carolina.
20    Q    Is that all?
21    A    There may have been a location -- I think we were
22 already out of Virginia and Louisiana and Mississippi at the
23 time that we had the auction and I think we had sold the
24 locations in Florida before we had the auction.
25    Q    When you sold those locations, how were they sold?
```

PAGE 116

```
 1    A    You mean the locations, other than the ones we sold
 2 at the auction?
 3    Q    Right.  You had mentioned that you had sold
 4 locations in Florida.  You just -- how -- did you advertise
 5 those or did somebody sell them for you?
 6    A    Sometime we would have a guy -- we sold one to a guy
 7 in Aiken, South Carolina that was a lot manager.  He wanted to
 8 buy the location and we sold it to him, and we sold another one
 9 to a guy called Dock Stukes and he's -- I'm not sure what part
10 of -- he's from South Carolina, but I'm not sure of the
11 location.  We sold a location we had in Florida to an
12 independent dealer that had a couple of other locations and he
13 wanted that location and --
14    Q    When you're talking about selling a location, if
15 H & S didn't own any real property, what is it they sold?
16    A    Sold the office and telephone equipment and --
17    Q    When you say the office, you're talking about some
18 kind of mobile type office?
19    A    We generally used our product.  It'd be some sort of
20 24 or 27, 32 wide, and the computer system.  You might have had
21 a pickup truck or a service truck or van or -- you know, you
22 can say, well, if you -- you can have 2,500 concrete block at a
23 location where you block and level the houses to show them, you
24 know, and the skirting on the houses.  The setting of the lots,
25 lot models, you know, costs you -- you used to go out there and
```

N. Dudley Horton, Jr.          5/21/08

SHEET 30   PAGE 117

1  set a house for $300 and now it'll cost you 1,500 to $5,000 to
2  get it set and ready to show. You might build a porch on it or
3  certainly a little stoop and it's -- having been through it, it
4  costs a lot more to open a sales center than it used to and a
5  lot more than you think it does till you go out there. You can
6  put down $5,000 worth of gravel and you can't tell the gravel
7  truck's even been there.
8      Q    Well, my question was going to be, you opened up
9  around 50 locations, you loaned H & S -- Horton Homes, Inc.
10  loaned H & S over 39 million dollars to open up 50 locations.
11  I mean, what is it that was costing so much money on these 50
12  locations? I mean it wasn't a million dollars a location, was
13  it?
14     A    No, sir, no, sir, it didn't cost a million dollars a
15  location, but we were required to spend 70 something thousand
16  dollars in Jonesboro, Georgia on the landscaping by the zoning
17  people up there to approve the location, and it -- we spent an
18  awful lot of money doing it.
19     Q    Do you know any of the names of any of the employees
20  of Triangle?
21     A    I really do not.
22     Q    Did any of the H & S employees go over to Triangle
23  or the subsidiaries?
24     A    Yes, I think some of them were hired.
25     Q    Do you know who?

PAGE 118

1      A    No, sir.
2      Q    Did you ever terminate anybody from H & S for doing
3  a bad job?
4      A    Quite a few. Probably more than we had left.
5      Q    Can you give me some of their names?
6      A    I couldn't off the top of my head. As I told you
7  several times, I was not involved in the day-to-day operation
8  of H & S. I know that they fired this fellow for stealing.
9  They fired this fellow for not doing his job. They fired this
10  fellow for going off in the company truck and staying three
11  days and they fired this fellow for various and sundry reasons
12  and it's one of the headaches of retail.
13         You put a manager there and he does a pretty good
14  job and he's hurting competition and competition says, hey, why
15  don't you do this for yourself; we'll help you get in business,
16  and your manager's no longer there, and so the next manager you
17  get is not as capable or maybe he's more capable, but there's a
18  learning curve and a start-up to do. If you start out every
19  location with no prospects or no people you've talked to and
20  there are an awful lot of people that come to a manufactured
21  housing sales center that are planning on getting married this
22  June or Christmas and they're looking for a house, so they're
23  talking about a house and they probably don't have a lot or
24  they want to put it on Mama and Daddy's lot and you've got to
25  get it surveyed and deeded and it's a little different

PAGE 119

1  operation from what it used to be. It used to be somebody
2  would come on the lot at 2:00 o'clock, finance company would
3  approve the deal by 5:00 o'clock and you'd deliver the house
4  tomorrow and, next week, they'd live in the house. Now it
5  takes you 30 days to get the permits to be able to do what you
6  have to do and it just takes a lot longer to do a deal.
7      Q    But getting back to my question on H & S people, can
8  you not name anybody that's been terminated as a result of
9  doing a bad job, you having to liquidate the company, several
10  million dollars in debt? I mean was nobody terminated?
11     A    Larry Dinkens was terminated.
12     Q    When did that occur?
13     A    Several years ago. I don't recall.
14     Q    Why was he terminated?
15     A    He wasn't getting the job done.
16     Q    Where is he now?
17     A    I don't know.
18     Q    Where did he live when he was working for the
19  company?
20     A    He moved there form North Carolina and I think he
21  lived at -- he lived out near the lake. I don't know whether
22  he lived in one of the plantations or not.
23     Q    In Eatonton?
24     A    Yes, sir, or Greensboro. Reynolds is actually in
25  Greensboro or Greene County, the next county over.

PAGE 120

1      Q    Who was the one that went to Mr. Dinkens to tell him
2  he was being terminated?
3      A    I don't know whether Bill Weeks terminated him or
4  Steve Sinclair.
5      Q    Did you talk to him about being terminated?
6      A    Did I talk to Larry Dinkens about being terminated?
7      Q    Yes, sir.
8      A    Or to them?
9      Q    To Larry Dinkens?
10     A    No, sir, I don't think so.
11     Q    Anybody else terminated for doing a bad job?
12     A    Yes, sir. I thought I could -- I saw some names in
13  here a while ago that --
14     Q    Just take your time.
15     A    -- kind of rang a bell with folks that had been
16  there. Jim Strickland was terminated.
17     Q    Why was he terminated?
18     A    Not doing what he was told to do.
19     Q    What was it he was told to do that he didn't do?
20     A    Didn't follow instructions.
21     Q    Whose instructions?
22     A    The company's instructions.
23     Q    From who?
24     A    Well, his immediate boss was probably Tom Leach.
25     Q    So, Mr. Strickland was terminated by Tom Leach?

N. Dudley Horton, Jr.          5/21/08

SHEET 31  PAGE 121

1    A    I'm not sure whether Tom Leach terminated him or
2  Steve Sinclair terminated him.
3    Q    But you didn't?
4    A    I might have.
5    Q    What did Mr. Strickland not do or do that got him
6  terminated?
7    A    He wasn't following procedure on what you should do
8  in obtaining a loan for a customer.
9    Q    Can you go more in detail than that?
10   A    I don't remember the very specifics of it.  I just
11 remember that he happened to be Jamie Reynolds' nephew and, you
12 know, I was sorry to see it happen, but he wasn't doing what he
13 was told to do.
14   Q    He was getting financing for a customer of H & S?
15   A    Yes, sir.
16   Q    What employment did Jim Strickland have at the
17 H & S?
18   A    What what?
19   Q    What was his position there at H & S?
20   A    Oh, he worked his way up.  I think he was actually
21 at one time the general manager.
22   Q    He was general manager of H & S?
23   A    I think so.
24   Q    Not just one particular lot, but the whole H & S?
25   A    He worked in the home office of H & S there.

PAGE 122

1    Q    And how did he have contact with a customer to give
2  the customer some type of financing?
3    A    I'm not trying to be evasive, but you're asking me
4  some questions that I've told you repeatedly that I was not
5  involved in the day-to-day operation.  He didn't do what he was
6  told to do and he got fired.
7    Q    Well, who told you that?
8    A    That he didn't do what he was supposed to?
9    Q    And that he got fired.
10   A    I don't recall who told me and, as I told you a
11 little earlier, I may have been the one that fired him.  I
12 don't see those names in here.  Steve Sinclair could give you a
13 good list of names of people that have been fired.
14   MR. PAUL:    Do you want him to keep
15        looking in this book here?
16   MR. MYERS:    Yeah, if he can tell me
17        some other names by looking through there.
18   THE WITNESS:    A    It was a list of where they
19 had five or six people.
20   MR. MYERS:    Q    Was it this list here?  Does
21 that help you?
22   A    Uh-uh.  It was a Lewis fellow, and I think his name
23 was Robert Lewis, but I hesitate to say that was him, but --
24 and it was a Wilke.  Here it is.  Bob R. Lewis.
25   Q    Is that a female or male?

PAGE 123

1    A    A male.  Bob, initial R., Lewis.
2    Q    And he was terminated?
3    A    Yes, sir.
4    Q    What did he do for the company?
5    A    He was corporate sales manager at the time.
6    Q    When was that that he was terminated?
7    A    February 2nd, '98 was when he was made corporate
8  sales manager.  I don't know how long after that it was that he
9  was terminated.  Gary Maddox was terminated.
10   Q    Do you know where those two men live now?
11   A    No, sir.
12   Q    What did Mr. Maddox do for H & S?
13   A    He was a regional manager.  You can look at the
14 H & S payroll journal and tell there's been a good turnover of
15 people.
16   Q    But Mr. Sinclair ought to be the one that can tell
17 that?
18   A    Yes, sir.
19   Q    What about a fellow named Jack Hay; do you know him?
20   A    Jack?
21   Q    Hay.
22   A    H-a-y?
23   Q    Yes, sir.
24   A    Jack Hay?  I don't believe I do.
25   Q    Now, one of the minutes of H & S, dated 2-16-05, at

PAGE 124

1  10:00 o'clock a. m., that's in that book there, but I'm going
2  to take mine out so you won't have to rummage through there to
3  look for it.
4    A    Yes, sir.
5    Q    Now, does that refresh your recollection on Mr.
6  Strickland, as to how he got -- or was no longer working for
7  the company?
8    A    Yes, sir.
9    Q    What do those minutes say?
10   A    Well, it says:  Chairman Horton informed the Board
11 that he had accepted Jim, James G. Strickland's resignation as
12 of February 15th, 2005.
13   Q    Did Mr. Strickland resign or was he fired?
14   A    Well, he was given the choice that we'll fire you or
15 we'll accept your resignation.
16   Q    And you were the one that gave him that choice?
17   A    Apparently, I was.  You know, I told you I might
18 have been the one.  Nobody in particular wanted to do it.  A
19 lot of times they save things like that for me, if it's
20 something unpleasant to do.
21   Q    Was he any kin to David Strickland?
22   A    Not to my knowledge, no, sir.  He was -- David
23 Strickland was from Augusta and Jim Strickland is from
24 Greensboro.
25   Q    Has Triangle or its subsidiaries borrowed any money

N. Dudley Horton, Jr.        5/21/08

SHEET 32  PAGE 125

```
 1   from Horton Homes, Inc.?
 2      A    No, sir.
 3      Q    Has it borrowed money from Horton Industries?
 4      A    I would think they probably had.
 5      Q    Do you know how much money was put into Triangle or
 6   its subsidiaries to capitalize it?
 7      A    No, sir.
 8      Q    Now, the notes between H & S Homes and Horton Homes,
 9   Inc., the notes that we have talked about previously --
10      A    Yes, sir.
11      Q    -- who determined what the interest would be on
12   those notes?
13      A    I did.  We pretty standardly in good times, bad
14   times or average times, charge nine percent interest to our
15   subs or affiliates.  We've always done it.
16      Q    That's just your standard interest rate?
17      A    Yes, sir.
18      Q    Is that what you charge other entities that are not
19   your affiliates?
20      A    We hardly ever loan any money at less than nine
21   percent.
22      Q    And some of the interest rates on these notes
23   appeared to be 11 percent.  Was there a reason for that?
24      A    To H & S?
25      Q    Yes, sir.
```

PAGE 127

```
 1      Q    Yeah.  I mean how would -- how would we look at one
 2   of these individual notes that -- we've seen all these notes
 3   and know that it's been paid or not?
 4      A    I would think that we had given the note back to the
 5   -- to whoever paid the note.
 6      Q    Marked paid?
 7      A    I like the way you do that.
 8      Q    Well, it's a stamp.
 9      A    We don't have a paid stamp, so --
10      Q    Would somebody write paid on it?
11      A    Well, they should, but as to whether they did or
12   not, I don't know.
13      Q    I mean would they have written paid on it?  They
14   don't have to stamp it on there.
15      A    They should have, but as to whether they did or not,
16   I don't know.
17      Q    But you said when a note is paid off, H & S would
18   have paid the principal and the interest?
19      A    Well, the intent was for them to do that.  You know,
20   when it got to the point we were trying to collect what we
21   could collect and I think when we were giving them credit for
22   it, there was no question in anybody's mind that there wasn't
23   going to be enough money there to pay the principal, much less
24   the interest.
25      Q    Was the 22 million dollar lawsuit, did that include
```

PAGE 126

```
 1          MR. PAUL:    Can you let him see the ones that
 2   -- see if there's a time matter?
 3          MR. MYERS:    This is Exhibit 13, which is
 4   a -- looks like 32 million dollars at 11 percent.
 5      Q    Was the interest real high in 2001?
 6      A    I can't testify for you.
 7      Q    I don't know.  I would have thought it would have
 8   been for 9, but it was 11.
 9      Q    Do you know who would have made that decision?
10      A    I do not.  It may be an error on the person that
11   drew the note.  They may have drawn it for 11 instead of 9, but
12   Bill Weeks signed it.
13      Q    On this ledger that we've got here, Exhibit 5, the
14   balances that are owed there, do those include interest?
15      A    It's -- to the best of my knowledge, it does not.
16   There hadn't been any interest accrued on them.
17      Q    When you say there's no interest accrued on them,
18   what do you mean by that?
19      A    Well, we haven't added the interest in and put it in
20   that figure.  It's just -- that's just principal.
21      Q    Is there another document that shows the interest?
22      A    No, sir.  You'd have to figure it on the individual
23   note, but we generally do that when they pay them.
24      Q    How do you know when an individual note's been paid?
25      A    Good question.  Do I know?
```

PAGE 128

```
 1   interest that was accrued?
 2      A    My understanding it did not.
 3      Q    Well, if you're trying to get a write-off, why
 4   wouldn't you have included interest on it?
 5      A    Well, I don't think the government will let you do
 6   that.
 7      Q    You had mentioned that when H & S started to unwind
 8   and shut down --
 9          MR. PAUL:    I think he said wind down,
10   but maybe--
11          MR. MYERS:    Well, is there any difference
12   between unwinding and --
13          MR. PAUL:    I don't know.  Go ahead.
14          THE WITNESS:    What's your question?
15          MR. MYERS:    Well, I don't know.  I can't
16   remember the exact words you used, but it's my understanding
17   that at some point in time, H & S wound down and shut down;
18   right?
19      A    Yes, sir.
20      Q    You had mentioned that creditors, other creditors,
21   were paid off 100 percent.
22      A    Yes, sir.
23      Q    Do you know how much was paid to those creditors?
24      A    I do not, but the books would reflect that.  It's
25   whatever was owed.
```

DEPOSITION

OF

HORTON HOMES
CORPORATE REPRESENTATIVE

N. Dudley Horton, Jr.    30(b)(6)        5/21/08

---

**SHEET 1    PAGE 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


HORTON HOMES, INC.,            :

            Plaintiff        :
                             : CIVIL ACTION NO.
    vs.                      :
                             : 2:07-CV-506(MEF)
LARUE BANDY, MARIE BANDY,     :
PATRICK PRITCHETT, WILLIAM    :
SHANER, ELSIE FONDREN AVERETTE, :
WILLIAM CRUTHERDS, and SHERRIE :
CRUTHERDS,                    :
                             :
            Defendants.      :

---------------------------------

MACON, GEORGIA    3:50 P. M.    MAY 21, 2008
    The 30(b)(6) deposition of N. DUDLEY HORTON, JR. is being
taken by the Defendants; testimony is given before Jeweldine
Johnston, Georgia Certified Court Reporter A-89, in the offices
of Hall, Bloch, Garland & Meyer, Suite 1500, 577 Mulberry
Street, Macon, Georgia, on May 21, 2008, beginning at
approximately 3:50 p. m.

---

**PAGE 2**
APPEARANCES:

For the Plaintiff:    MR. SYDNEY F. FRAZIER, JR.
                      Cabaniss, Johnston, Gardner,
                          Dumas & O'Neal, LLP
                      Park Place Tower, Suite 700
                      2001 Park Place North
                      Birmingham, Alabama  35203

                      MR. JAMES L. PAUL
                      Chamberlain Hrdlicka
                      191 Peachtree Street, N.E.
                      Thirty-fourth Floor
                      Atlanta, Georgia  30303-1747

For the Defendants:   MR. FRANK H. HAWTHORNE, JR.
                      MR. RANDY MYERS
                      Hawthorne & Myers, L.L.C.
                      322 Alabama Street
                      Montgomery, Alabama  36104

                      MR. MICHAEL HARPER
                      P. O. Box 780608
                      Tallassee, Alabama  36078

                      MR. F. KENNEDY HALL
                      Hall, Bloch, Garland & Meyer, LLP
                      577 Mulberry Street, Suite 1500
                      Macon, Georgia  31201


Also present: Ms. Chris Brooks, Videographer

---

**PAGE 3**

1            N. DUDLEY HORTON, JR.
2        having first been duly sworn by the
3            court reporter, testified on
4            CROSS-EXAMINATION
5 BY MR. MYERS:
6    Q    Mr. Horton, we had requested that Horton Homes, Inc.
7 provide us a corporate representative that had knowledge
8 concerning certain topics and you've been designated as a
9 representative of --
10    A    Yes, sir.
11    Q    -- Horton Homes, Inc. to testify concerning certain
12 topics and, in your previous deposition, we've gone over
13 numerous of these topics and I'm not going to go over them
14 again; I just want to make sure we haven't left anything out.
15        The first topic that you were designated in was the
16 corporate structure of Horton Homes, Inc., including but not
17 limited to the parent, subsidiaries and other related business
18 entities.
19        I'm going to give you a copy of that.
20    A    Yes, sir
21    Q    We've already been through that, so I'm not going to
22 go through that again.
23    A    Yes, sir.
24    Q    The second topic was the identity of the officers,
25 directors and shareholders of Horton Homes, Inc., and we've

---

**PAGE 4**
1 gone through that somewhat.  Are you able to testify as to all
2 the officers, directors and shareholders of Horton Homes, Inc.
3 at all times?
4    A    You mean the --
5        MR. PAUL:    Excuse me.  We, on behalf of
6 Horton Homes, had read that to mean the current
7 officers, directors and shareholders, and we have
8 brought a list of those people, so it's not a memory
9 test.  The officers, directors and shareholders are
10 indicated in the minutes that you've already gotten,
11 but we -- we produced the minutes and so --
12        MR. MYERS:    Do you have the list?
13        MR. PAUL:    Yes, I have a -- you want to mark
14 it as an -- this is a submission related to the
15 current officers, directors and shareholders of Horton
16 Homes, Inc. and he can testify from it, I don't mind
17 him testifying, I'm just saying we had not understood
18 that you wanted a witness to talk about 38 years of
19 officers, directors and shareholders.  I don't believe
20 that's possible.
21        MR. MYERS:    Okay.  That's fine.  Can I have
22 this marked, please?
23        MR. MYERS:    Q    Let me show you what's been
24 marked as Exhibit No. 23, and tell us what that is.
25    A    It's a list of the officers and directors and

---

Court Reporting Associates, Inc.        (478) 742-1459

N. Dudley Horton, Jr.    30(b)(6)    5/21/08

SHEET 3   PAGE 9

1  of them and I don't know where they came from.
2      Q    No. 10, it's got the financing by Horton Homes, Inc.
3  of the wholesale purchase of mobile homes by H & S Homes, LLC,
4  and I think we've already covered all that.
5      A    Yes, sir.
6      Q    No. 11 is all loans or payments made by Horton
7  Homes, Inc. to H & S Homes, LLC at any time and for any
8  purpose. Now, when I was asking you questions about loans and
9  notes and all that, it is my understanding that you were
10  telling Mr. Sinclair would be the best one to testify about
11  that, also; correct?
12      A    Yes, sir.
13      Q    No. 12, all payments made by H & S Homes, LLC to
14  Horton Homes, Inc. at any time and for any purpose. It's got
15  you listed as the person most knowledgeable about that, but
16  again, would Mr. Sinclair be most knowledgeable about those?
17      A    On the ledgers, he would, yes, sir.
18      Q    No. 13 is all -- have we got a handout?
19          MR. PAUL:    I do have a handout for you that
20  may help you here. It's not something you haven't
21  seen before. It talks about another category of
22  payments.
23          MR. MYERS:    Could I staple these together?
24          MR. PAUL:    Sure.
25          MR. MYERS:    Could I have this marked, please?

PAGE 10

1          MR. MYERS:    Q    And again, the handout that
2  I've got, Exhibit No. 25, talks about the notes and the general
3  ledgers and so forth, and you indicated that Mr. Sinclair would
4  be the best one to testify about those; correct?
5      A    Yes, sir.
6      Q    That was No. 12. No. 13 says: All documents
7  pertaining to any loan made by Horton Homes, Inc. to H & S
8  Homes, LLC. And it's got you listed as the person.
9          MR. MYERS:    Do y'all have a handout on
10  that one?
11          MR. PAUL:    I think you've already seen it,
12  but I'll let you see it.
13          MR. MYERS:    Q    I'm going to show you
14  Defendant's Exhibit 26 -- and if I've said Plaintiff's exhibits
15  for any of these, I didn't mean to; all these have been
16  Defendant's exhibits -- which again talks about the loans and
17  the general ledgers and checks evidencing loans and checks
18  evidencing repayment of loans. Mr. Sinclair would be the best
19  one to testify about those, wouldn't he?
20      A    That'd be correct, yes, sir.
21      Q    No. 14 --
22          MR. PAUL:    It doesn't matter to me.
23  There was a second page to that exhibit. It doesn't
24  really matter to me.
25          MR. MYERS:    Q    No. 14 talks about all debts

PAGE 11

1  or obligations owed by H & S Homes, LLC that have been paid by
2  Horton Homes, Inc., including but not limited to payment of
3  overhead or operating expenses. And it's got you down
4  there as the corporate representative to testify about that.
5      A    I think again Mr. Sinclair would be the one to show
6  you where the Horton Homes was reimbursed by H & S Homes by
7  check for any overhead items they paid.
8          MR. HAWTHORNE:    Got a handout for that one,
9  too?
10          MR. PAUL:    Uh-uh, don't think so. No.
11          MR. MYERS:    Q    No. 15 talks about the
12  lawsuit, the 22 million dollar lawsuit, and we've already
13  covered that.
14      A    Yes, sir.
15      Q    And is there anything that you, as a corporate
16  representative of the company, want to change your testimony
17  from your individual deposition concerning that lawsuit?
18      A    No, sir.
19      Q    Then No. 17 is all meetings of Horton Homes, Inc.'s
20  Board of Directors that in any way touch on or pertain to H & S
21  Homes, LLC. I think we've covered that.
22      Are there -- the few topics that you would be the
23  proper person for testifying as a 30(b)(6) representative where
24  you've already given your deposition individually, on any of
25  those topics, do you want to change your testimony concerning

PAGE 12

1  those topics or any questions asked about those topics?
2      A    No, sir.
3      Q    And on those topics, you would adopt your prior
4  testimony as an individual?
5      A    Yes, sir.
6          MR. MYERS:    That's all.
7  (DEPOSITION CONCLUDED AT 4:10 P. M.)
8  -----------------------------------------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25